THE STATE OF FLORIDA *ex rel.* WILLIAM H. ELLIS, AT-
TORNEY GENERAL, *Plantiff in Error,* v. GUSTAV
GERBING, *Defendant in Error.*

1. The navigable waters in the State and the lands under such
waters including the shore or spaces between ordinary high and
low water marks, are the property of the State or of the people
of the State in their united or sovereign capacity. Such lands
are not held for purposes of sale or conversion into other values,
or for reduction into several or individual ownership, but for
the use of all the people of the State for purposes of naviga-
tion, commerce, fishing and other useful purposes afforded by
the waters thereon.

2. The title to lands under navigable waters in the State including
the shore or space between high and low water marks is held
by the State in trust for the use of its inhabitants, such title
being essential to the sovereignty of the State, to the proper
exercise of the police power and to the welfare of the people
of the State.

3. The State may in the interest of the public welfare, make
limited disposition of portions of the lands under navigable
waters within its borders, or may permit the use thereof, when
the rights of the whole people of the State as to navigation and
other uses of the waters are not materially impaired.

4. The State cannot abdicate general control over the lands under
navigable waters within the State, since such abdication would
be inconsistent with the implied legal duty of the State to pre-
serve and control such lands and the waters thereon and the
use of them for the public good.

5. The rights of the people of the State in the navigable waters
and the lands thereunder including the shores or spaces between
ordinary high and low water marks, are designed for the public
welfare, and the State may regulate such rights and the uses of
the waters and the lands thereunder for the benefit of the
whole people of the State as circumstances may demand, sub-
ject of course to the powers of Congress in the premises.

6. For the purpose of aiding navigation or commerce, or of encouraging new industries and the development of natural or artificial resources in the interest of all the people, the State may grant reasonable and limited rights and privileges to individuals in the use of lands under navigable waters in the State, but such privileges should not unreasonably impair the rights of the whole people of the State in the use of the waters or the lands thereunder for the purposes implied by law, nor relieve the State of the control and regulation of the uses afforded by the lands and the waters thereon.

7. The statute providing for limited privileges to individuals to plant oysters in the public waters of the State does not authorize the conveying of title to the land, and the statute expressly enacts that the privileges acquired under the act shall not obstruct or interfere with navigation, and that all existing natural or material oyster beds shall remain for the free use of the citizens of this State.

8. The protraction of lines of survey over the bed of a navigable river and the issue of patents therefor do not change the character of the title by which the lands under the river are held by the State.

9. The State may fix the exterior lines of a navigable river if the rights of the people to the use of the waters and the shores of the river are not thereby substantially impaired; and submerged lands not within the exterior lines of the river may be disposed of by legislative authority if such disposition does not impair the rights of the whole people to the use thereof for any purpose expressed or implied by law.

10. The Act of Congress granting swamp and overflowed lands to the State for purposes of drainage and reclamation does not cover or include tide lands or lands under navigable waters including the shores or spaces between ordinary high and low water marks in the State.

11. The shores of a navigable river are the spaces between high and low water marks, and the bed of the river includes the shores. Tide land is that which is daily covered and uncovered by water by the ordinary ebb and flow of normal tides.

12. Swamp lands, as distinguished from overflowed lands, are such as require drainage to dispose of needless water or moisture on or in the lands, in order to make them fit for successful and useful cultivation.

13. Overflowed lands are those that are covered by non-navigable waters or are subject to such periodical or frequent overflows of water, salt or fresh (not including lands between ordinary high and low water marks of navigable waters), as to require drainage or levees or embankments to keep out the waters, and thereby render the lands suitable for successful cultivation.

14. Lands in this State belonging to the United States that were not covered by navigable waters at ordinary high water mark and that required drainage or leveeing to render them suitable for the ordinary purposes of husbandry at the date of the Act of Congress granting swamp and overflowed lands to the State, were included in the act, and title thereto passed to the State 'under the provisions of the act.

15. The Trustees of the Internal Improvement Fund are not authorized to convey the title to lands under navigable waters below ordinary high water mark.

This case was decided by Division A.

Writ of Error to the Circuit Court for Nassau County.

The facts in the case are stated in the opinion of the court.

*Fleming & Fleming,* for plaintiff in error.

*H. J. & H. J. Baker,* for defendant in error.

WHITFIELD, J.—Stated briefly this is a *quo warranto* proceeding brought in the Circuit Court for Nassau County by the Attorney General to ascertain by what warrant or authority Gustav Gerbing has marked and

staked off certain portions of the bed of Amelia river, a navigable stream in Nassau county, Florida, and claims and usurps the exclusive right to the use, benefit and enjoyment of, natural or maternal oyster beds upon the designated land below high water mark and extending to the channel of said navigable river.

By answer the respondent denies that he has staked off a portion of the bed of Amelia River below high water mark; avers that the only lands marked and staked off by respondent are certain salt marsh lands known and designated as lots and parts of sections; that the salt marsh lands near the rivers, inlets and bays in the State of Florida were never treated and considered by the United States or the State of Florida as a part of the beds of the navigable streams, inlets and bays in said State, which vested in the State by virtue of its sovereignty, but were treated and considered by the State and the United States as part of the swamp and overflowed lands which belonged to the United States and were granted to the State by Act of Congress in 1850; that the lands marked and staked by respondent and planted by him with oysters are owned by him in fee simple by virtue of a chain of title, to-wit: (1) the Act of Congress of 1850, granting to the State the swamp and overflowed lands; (2) a selection by the State of these lands as part of the lands inuring to the State under said Act of Congress; (3) a patent from the United States to the State of Florida; (4) a deed from the State by the Trustees of the Internal Improvement Fund to Samuel A. Swann, and a deed from said Swann to respondent; that the lands being marsh were not surveyed in the original survey made by the United States, but by request of the State the lines of surveys were by the United States authorities protracted over said lands as marsh

lands, and said marsh lands were patented to the State as swamp and overflowed land; that the lands staked by respondent do not extend to the channel of Amelia river; that respondent has not without authority or warrant of law claimed and usurped the exclusive right to the use, benefit and enjoyment of any natural and maternal oyster beds within the bed of Amelia river, but has only claimed the exclusive right to the use and benefit of the oyster beds planted by him on lands owned by him as aforesaid; that respondent received from the County Commissioners under the statute the exclusive right to plant oysters in such places along the Amelia river where the lands of respondent border on said river, but the lands so marked, staked and planted by respondent were upon the lands owned by respondent as before stated.

The court sustained a demurrer to a replication, and the relator joined issue on the respondent's answer.

The cause was by agreement tried by Honorable D. U. Fletcher, a practicing attorney, as referee, who found that the respondent claims to own the lands described, or at least that portion thereof not in the channel of Amelia river, and has run a line of stakes along the easterly edge of the navigable portion of Amelia river within the lines protracted over the lands; that most of the stakes are set below low water mark but are not in the channel of Amelia river; that there are natural or maternal oyster beds along the edge of the navigable portion of Amelia river where some of the stakes extend below low water mark and some such oyster beds are between the stakes and high water mark; that the land is marsh or mud flats extending between the channel and shore of Amelia river, all of which is usually covered with water at high tide, and exposed or not covered, except to a limited extent, at low tide; that the respondent

has planted oysters above the stakes, and has forbidden any one to go upon or get oysters from the beds above the stakes on land below high water mark, and insists that he owns exclusively as his private property as stated in the answer, the said land and everything on it including the oysters. The conclusion of the referee was that the *locus in quo* is swamp and overflowed land, and flats, not a part of the bed of the Amelia river, and the proceedings were dismissed.

The original thirteen States that formed the Federal Union as the United States of America, were distinct and independent sovereignties, and as such severally owned and held in trust for the whole people within their respective borders, the navigable waters in the States and the lands thereunder including the shore or land between high and low water marks. Proprietary rights in the lands of this character within the States were not passed to the United States by the Federal Constitution under which the Union was founded, and no power to dispose of such lands was delegated to the United States, therefore all proprietary rights in and power to dispose of lands under navigable waters in the States including the shore between high and low water marks were reserved to the States severally or to the people thereof. The powers of the United States as to matters of navigation, interstate and foreign commerce, post roads and eminent domain are not pertinent here.

The navigable waters in the States and the lands under such waters including the shore or lands between ordinary high and low water marks, are the property of the States or of the people of the States in their united or sovereign capacity, and are held not for the purposes of sale or conversion into other values, or reduction into several or individual ownership, but for the use of all the people of

the States respectively, for purposes of navigation, commerce, fishing and other useful purposes afforded by the waters in common to and for the people of the States. The title to the lands of this character were withheld by the original States of this Union as essential to the sovereignty of the States, to the welfare of the people of the States, and to the proper exercise of the police powers of the States. A State may make limited disposition of portions of such lands or of the use thereof in the interest of the public welfare, where the rights of the whole people of the State as to navigation and other uses of the waters are not materially impaired. The States cannot abdicate general control over such lands and the waters thereon, since such abdication would be inconsistent with the implied legal duty of the States to preserve and control such lands and the waters thereon and the use of them for the public good.

By treaty of February 22, 1819, the Kingdom of Spain ceded "to the United States, in full property and sovereignty, all the territories * * * known by the name of East and West Florida," with an expressed provision that all the grants of land made by Spain before January 24, 1818, in said territories shall be ratified and confirmed to the persons in possession of the lands. Articles 2 and 8 of Treaty to be found in Fuller's Purchase of Florida, pages 372-374.

The lands in controversy are within the ceded territory, but it is not claimed that they had been granted to any one by Spain.

After the United States acquired by treaty of cession from Spain the territory known as East and West Florida, such territory was held subject to the constitution and laws of the United States. The lands under navigable waters including the shores were held by the Uni-

ted States for the benefit of the whole people to go to the future State for the use of the whole people of the State.

The constitution of the United States provides that "new States may be admitted by congress into this union." The territory known as East and West Florida ceded by Spain to the United States was by Act of Congress approved March 3, 1845, under the name of the State of Florida, "admitted into the Union on equal footing with the original States, in all respects whatsoever," "on the express condition that (the State) shall never interfere with the primary disposal of the public lands lying within" it.

The admission of the State of Florida "into the Union on equal footing with the original States, in all respects whatsoever" gave to the State of Florida all rights and powers as to property and sovereignty possessed by the original States of the Union, except such as were withheld by the act admitting the State.

Among the rights thus acquired by the State of Florida is the right to own and hold the lands under navigable waters within the State including the shores or space between ordinary high and low water marks, for the benefit of the people of the State, as such right is as essential to the sovereignty, to the complete exercise of police powers and to the welfare of the people of the new States as of the original States of the Union. Shivley v. Bowlby, 152 U. S. 1, 14 Sup. Ct. Rep. 548; Mobile Dry Docks Co. v. Mobile, 146 Ala., 198, 40 South. Rep. 205, 9 Am. & Eng. Anno. Cas. 1299.

The condition or restriction expressed in the act of admission as to "the primary disposal of the public lands lying within" the State, has reference to lands within the territorial limits of the State, the title to which was in

the United States for its own purposes, as distinguished from lands held in trust for the people, such as lands under navigable waters including the shore between high and low water marks, which passed to the sovereign State to be held by it in trust for the people thereof when the State was "admitted into the Union on equal footing with the original States, in all respects whatsoever."

The rights of the people of the State in the navigable waters and the lands thereunder including the shores or space between ordinary high and low water marks, in the State, are designated for the public welfare, and the State may regulate such rights and the uses of the waters and the lands thereunder for the benefit of the whole people of the State as circumstances may demand, subject of course to the powers of the congress in the premises. The shores of a navigable river are the spaces between high and low water marks, and the bed of a river includes the shores. Tide land is that daily covered and uncovered by water by the ordinary ebb and flow of normal tides. I Farnham on Waters, 227; Baer v. Moran, 153 U. S. 287; Baird v. Campbell, 67 N. Y. App. Div. 104.

For the purpose of aiding navigation or commerce or of encouraging new industries and the development of natural or artificial resources, the State may grant reasonable and limited rights and privileges to individuals to erect wharves, &c., over shallow waters to reach navigable portions of the waters, or to fill in shallow waters adjacent to navigable waters and erect structures thereon. for purposes of commerce incidental to navigation on the waters; or the State may grant reasonable and limited privileges for planting and propagating oysters or shell fish on land covered by waters of navigable streams; but such privileges should not unreasonably impair the rights of the whole people of the State in the use of the waters or the lands thereunder for the

purposes implied by law.    State v. Black River Phosphate Co., 32 Fla. 82, 13 South. Rep. 640.

The title to lands under navigable waters including the shores or space between ordinary high and low water marks, is held by the State by virtue of its sovereignty in trust for the people of the State for navigation and other useful purposes afforded by the waters over such lands, and the Trustees of the Internal Improvement Fund of the State are not authorized to convey the title to the lands of this character.

The trust with which these lands are held by the State is governmental and cannot be wholly alienated.   For the purpose of enhancing and improving the rights and interests of the whole people, the State may by appropriate means grant to individuals the title to limited portions of the lands, or give limited privileges therein, but not so as to divert them from their proper uses, or so as to relieve the State of the control and regulation of the uses afforded by the land and waters.    Illinois Cent. R. Co. v. Illinois, 146 U. S. 387, 13 Sup. Ct. Rep. 110.

By an act of the legislature the State in aid of commerce vests in the United States or citizens thereof owning lands actually bounded by, and extending to, the low water mark on navigable streams, bays and harbors in the State, title to the submerged lands in front of the abutting lands as far as to the edge of the channel, for the purpose of filling up from the shore, bank or beach, and of erecting structures thereon in aid of commerce, not obstructing the channel, but leaving full space for the requirements of commerce.    Gen. Stats. of Florida, §§ 643, 644.   This statute does not relate to planting oyster beds.

To develop resources and encourage industries the State by statute provides for granting limited privileges to individuals to plant oysters in the public waters of the

State. The statute provides that such rights shall not obstruct or interfere with the navigation of any of the navigable waters of the State, and also provides that all the existing natural or maternal oyster beds in the waters of the State are exempt from the provisions of the act, and that such natural or maternal oyster beds shall remain for the free use of the citizens of this State. Gen. Stats. of Florida, § § 646 to 651.

The protraction of lines of survey over the bed of a navigable river and the issue of patents therefor do not change the character of the title by which the lands under the river are held by the State. See Florida Town Imp. Co. v. Bigalsky, 44 Fla. 771, 33 South. Rep. 450; State ex rel. Attorney General v. Gibson, 48 Fla. 162, 37 South. Rep. 651; State ex rel. Kittel v. Jennings, 47 Fla. 307, 35 South. Rep. 986; Mann v. Tacoma Land Co., 153 U. S. 273; Barney v. Keokuh, 94 U. S. 324. The State may fix the exterior lines of a navigable river if the rights of the people to the use of the waters and shore of the river are not thereby substantially impaired, and submerged lands not within the exterior lines of the river may be disposed of by legislative authority if such disposition does not impair the rights of the people to the use thereof for any purpose expressed or implied by law.

The statute of 1881, authorizes the granting of limited exclusive privileges for planting oysters in the public waters of the State where there are no natural or maternal oyster beds, if the rights of the people in navigable waters are not thereby impaired; but this statute does not authorize the conveying of title to land, and expressly provides that the natural or maternal oyster beds in the waters of the State shall remain for the free use of the citizens of the State.

The referee finds that at least some of the lands upon which respondent claims exclusive oyster privileges are under the waters of a navigable river in the State, that there are natural and maternal oyster beds thereon, and that respondent claims title to the land and the oysters thereon under conveyances from the State since the date of the act providing that all natural or maternal oyster beds in the waters of the State shall remain for the free use of the citizens of the State.

Even if the lands constituting the bed of the navigable river could be conveyed by the trustees of the Internal Improvement Fund, they could not be so conveyed as to deprive the citizens of the State of the free use of natural or maternal oyster beds existing thereon as provided by the act of 1881.

The act of congress of September 28, 1850, granted to the State "the whole of the swamp and overflowed lands therein." This grant did not include lands the title to which was not then in the United States. As the admission of the State of Florida into the Union "on equal footing with the original States, in all respects whatsoever," gave to the State in trust for the people the navigable waters of the State and the lands thereunder including the shores or space between ordinary high and low water marks, the title to such lands was not in the United States when the act of 1850 was passed granting swamp and overflowed lands to the State. A patent issued by the United States to the State purporting to convey swamp and overflowed lands under the act of 1850 covering lands under the navigable waters of the State does not affect the title held by the State to the lands under navigable waters by virtue of the sovereignty of the State. See Edwards v. Rolley, 96 Cal. 408, 31 Pac. Rep. 267, S. C. 31 Am. St. Rep. 234. The

general act of congress granting swamp and overflowed lands to the States does not cover tide lands. Mann v. Tacoma, 153 U. S. 273.

The respondent's claim is grounded on an alleged title deraigned through the act of congress of September 28, 1850, granting swamp and overflowed lands to the State. If the lands in controversy are not such swamp and overflowed lands as passed to the State under the stated act of congress, and they are lands under the bed of navigable waters below the normal high water mark of the particular navigable waters, the State holds them in trust for all the people of the State and the defendant has no exclusive rights as claimed. See Kinkead v. Turgeon, 74 Neb. 573.

Lands within the limits of the State of Florida that are covered and uncovered by the ordinary daily tides of public navigable waters are shore or tide lands, and the title to them is held by the State because of its sovereignty under its admission into the Union.

Swamp and overflowed lands within the State of Florida, not under navigable or tide waters, that became the property of the United States by the treaty of cession from Spain and had not been previously granted, were by the act of congress approved September, 28, 1850, granted to the State for purposes of drainage and reclamation. Within the meaning of this act of congress, swamp lands, as distinguished from overflowed lands, are such as require drainage to dispose of needless water or moisture on or in the lands in order to make them fit for successful and useful cultivation. Overflowed lands are those that are covered by non-navigable waters or are subject to such periodical or frequent overflows of water, salt or fresh, (not including lands between high and low water marks of navigable streams or bodies of

water, nor lands covered and uncovered by the ordinary daily ebb and flow of normal tides of navigable waters), as to require drainage or levees or embankments to keep out the water, and thereby render the lands suitable for successful cultivation. When the lands are not covered by the waters of navigable streams or other bodies of navigable waters at ordinary high water mark, and drainage, reclamation or leveeing is necessary to render the lands suitable for the ordinary purposes of husbandry, they are within the terms of the act of congress, and the title passed to the State, if the lands were the property of the United States at the date of the act of congress making the grant to the State.

The referee finds that most of the stakes set by the respondent and at least a part of his claim of exclusive privilege as to oyster bed, are below low water mark, though not in the channel, of the navigable river.

As the respondent shows no legal claim to exclusive rights on lands under the navigable waters of the river including those lands between ordinary or normal high and low water marks, the referee should have entered a judgment against the respondent as to such lands below high water mark in which he claims exclusive privileges.

The judgment is reversed and the cause is remanded for proper proceedings to ascertain and adjudge definitely the rights of the parties under the principles herein stated.

SHACKLEFORD, C. J., and COCKRELL, J., concur;

TAYLOR, HOCKER and PARKHILL, JJ., concur in the opinion.