400 So.2d 488 (1981)
STATE of Florida, DEPARTMENT OF NATURAL RESOURCES, Appellant,
v.
CONTEMPORARY LAND SALES, INC., Appellee.
No. 80-375.
District Court of Appeal of Florida, Fifth District.
May 20, 1981.
Rehearing Denied July 8, 1981.
*490 Jack W. Pierce, and S. Sherman Weiss, Tallahassee, for appellant.
John F. Bennett, of Fishback, Davis, Dominick & Bennett, Orlando, for appellee.
COWART, Judge.
This case involves the application of the Marketable Record Title Act (§ 712.01 et seq., Fla. Stat. (1963)) to the title to land exposed by the lowering of the water level of a freshwater lake by a state water control agency.
The original U.S. Government survey, made in 1848, shows Section 18, Township 23 South, Range 26 East, as a fractional section with a couple of hundred acres of land on the west edge bordered on the east by the meandered shore of the navigable, non-tidal, fresh waters of what is now known as Lake Louisa in Lake County, Florida. Descriptions in the deeds in the chain of title refer to the fractional aspect of the section until a conveyance recorded December 23, 1938, described the land conveyed as the northwest quarter of the southwest quarter of the section. That description was used until a conveyance on August 29, 1966, described the property conveyed by metes and bounds as:
Begin at the SW corner of NW 1/4 of SW 1/4, Sec. 18, Tp. 23 S, R 26 E, and run thence north 36° 24' east 600 ft., thence east 964 ft., more or less, to the east line of said NW 1/4 of SW 1/4, thence south 482.9 feet, more or less, to the southeast corner of said NW 1/4 of SW 1/4, thence west 1320 feet, more or less, to point of beginning.
By various mesne conveyances this property, so described was conveyed to Contemporary Land Sales.
Lake Louisa is part of the Clermont chain of lakes whose water table was artificially lowered by a spillway constructed about August 8, 1956, by the Oklawaha Basin Recreation and Water Conservation Control Authority, an agency of the State of Florida.
At this time the description in the deed to Contemporary covers (a) some land which was original upland, (b) some land which was originally beneath the waters of Lake Louisa but has now been exposed by the lowering of the water level (i.e., land below the original high water mark and above the present lake level or "reclaimed lake bottom"), and (c) some land that is still beneath the present waters of Lake Louisa. Contemporary and its predecessors in title have paid ad valorem property taxes on the entire parcel described above for at least the last ten years.
Contemporary brought a quiet title action alleging the Marketable Record Title Act (§ 712.01 et seq., Fla. Stat. (1977)) extinguished all claims of the State to the property described above. The trial court entered summary judgment quieting Contemporary's title to those portions of the property in question lying west of a contour line running at an elevation of 96.4 feet NGVD[1] along the present shore of Lake Louisa. *491 The defendant State of Florida, Department of Natural Resources, appeals.
The State does not challenge the judgment quieting Contemporary's title to the original uplands and Contemporary did not appeal the trial court's judgment in effect denying Contemporary's action to quiet title to the portions of lands described above which are still underwater. Therefore, in this case we are concerned only with the title to land formerly, but not now, covered by the waters of Lake Louisa.
The original thirteen colonies became sovereign entities and owned the beds of their navigable waters. They did not give up that ownership when they formed the United States of America. Barney v. Keokuk, 94 U.S. 324, 24 L.Ed. 224 (1877); Pollard's Lessee v. Hagan, 44 U.S. 212, 11 L.Ed. 565, 3 How. 212 (1845); After the United States acquired West and East Florida from Spain in July, 1821, the lands under the navigable waters thereof, including the shores, were held by the United States for the benefit of the whole people, to go to the future state for the use of the whole people thereof. Ex parte Powell, 70 Fla. 363, 70 So. 392 (1915). States subsequently admitted to the Union have an equal status and when Florida was admitted as a state on March 3, 1845 (5 Stat. 742), by virtue of its sovereignty, it became the owner of all the land under navigable bodies of water within the state.[2] These lands are called sovereignty lands. Merrill-Stevens Co. v. Durkee, 62 Fla. 549, 57 So. 428 (1911); Broward v. Mabry, 58 Fla. 398, 50 So. 826 (1909). See also Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894). Under common law doctrine the State of Florida in its sovereign capacity holds title to the beds of navigable waters, including the shore or the space between high and low water marks, in trust for the people of the state who have rights of navigation, commerce, fishing, boating and other public uses. Brickell v. Trammell, 77 Fla. 544, 82 So. 221 (1919); Broward v. Mabry. Subject to these public rights the Legislature of the State of Florida has control over such sovereign trust lands but, it is said, may sell parts of such lands to private ownership when the public and private rights are not impaired. State ex rel Ellis v. Gerbing, 56 Fla. 603, 47 So. 353 (1908). Therefore the lands originally under the waters of Lake Louisa were sovereign lands.
The title to the uplands in question passed to the State of Florida as swamp and overflowed lands under the Act of September 28, 1850 (9 Stat. 519) and was conveyed into private ownership by the Trustees of the Internal Improvement Fund in 1883. Swamp and overflowed lands within the meaning of the act did not include any lands below navigable waters.[3] Conveyances of uplands, including swamp and overflowed lands, for ordinary private ownership purposes do not extend below the ordinary high-water mark of adjoining navigable waters and do not include sovereignty lands. While ordinarily a meander line is not necessarily a boundary line when conveyances do not expressly make the meander line one of the calls of the boundary, (Lord v. Curry, 71 Fla. 68, 71 So. 21 (1916)), the meander line shown on the original government survey is evidence of the ordinary high-water mark of the body of navigable water and of the boundary between the sovereignty lands below the high-water mark and uplands or lands under private ownership which are above the high-water mark. However, owners of uplands bordering navigable water usually have riparian rights, including the right to an increase of their lands by accretion and reliction. Accretion is the extension of land area due to a gradual, natural and imperceptible build up of additional land by the accumulation of alluvium material. Reliction is a similar increase of land area due to the lowering of the water level by natural causes. Under the doctrine of accretion and reliction, the added land belongs to the riparian owner, even as against the sovereign rights of the State. Mexico Beach Corporation v. St. Joe *492 Paper Company, 97 So.2d 708 (Fla. 1st DCA 1957), cert. denied, 101 So.2d 817 (Fla. 1958). On the other hand, it has been held in Florida that reliction does not apply where the land is reclaimed by the drainage operations of governmental agencies, in which case the State, not the upland owner, continues to own the former lake bottom, or sovereignty lands, that become uncovered and reclaimed between the original high water mark and the new lake water level resulting from the drainage operations. Martin v. Busch, 93 Fla. 535, 112 So. 274 (1927). While the purposes of the governmental action in this case was to control the water level of a chain of lakes and not, as in Martin, for the express objective of reclaiming land, nevertheless we hold that the result is the same and that an artificial lowering of the waters of Lake Louisa occurred and that the sovereign lands formerly beneath the lake waters continued to be sovereignty lands after they were exposed.
The Marketable Record Title Act, section 712.02, Florida Statutes (1963), provides, in effect, that any person whose chain of title extends from any title transaction recorded over thirty years has a marketable record title free and clear of all claims except those set forth in section 712.03, Florida Statutes. When the Marketable Record Title Act was originally adopted in 1963, and at all times relevant to this case,[4] section 712.03 contained no exception in favor of sovereignty lands. On the contrary section 712.04 indicated that all governmental rights depending on any act or event prior to the date of a root of title were extinguished excepting only rights in favor of the state reserved in deeds by which Florida parted with title. Of course, that exception is not applicable in this case.
Contemporary claims all of its lands were included in the NW 1/4 of the SW 1/4 of Section 18 and therefore its "root of title" (§ 712.01(2), Fla. Stat. (1979)) is from the conveyance recorded December 23, 1938, and that, effective December 23, 1968, the Marketable Record Title Act perfected its title to the property in question and barred the State's claims to that portion of the property in question lakeward of the original government meander line.
The question is therefore squarely presented: Can the Marketable Record Title Act as it existed prior to the 1978 amendment perfect title in a private owner to lands that would otherwise be owned by the State of Florida in its sovereign capacity and held in trust for all the people?
We read the Supreme Court's denial of certiorari in Modrall v. Sawyer, 297 So.2d 562 (Fla. 1974), and its decision in Odom v. Deltona Corp., 341 So.2d 977 (Fla. 1976), to answer the above question in the affirmative. Certainly, Justice Ervin, dissenting in Modrall, and Justices Sundberg, Overton and England, dissenting in Odom, understand those cases to have that meaning.[5] *493 Therefore, we feel compelled to answer the same question in the same way in this case.
The State does not really challenge the above point of law but argues in effect that the property description in Contemporary's chain of title is legally insufficient because section 18 was originally surveyed as a fractional section bounded on the east by Lake Louisa and the survey shows no internal half, quarter or quarter-quarter survey lines. The State argues that since the original government survey does not show a full section a description referring to a quarter-quarter section is legally insufficient and describes no land. In support of this proposition the following language is quoted from Mexico Beach Corporation v. St. Joe Paper Company, 97 So.2d at 709-10.
Appellant's contention that the State conveyed to its immediate successor in title a square section containing 640 acres is untenable. Sections and boundaries are created by Government survey and not merely designated thereby. Having been surveyed and created as a fractional section, the boundaries of Section 15 cannot be arbitrarily projected so as to make it a complete section containing the customary 640 acres.
The court in Mexico Beach held that a description in a conveyance referring to a section which was originally surveyed as a fractional section described only the original surveyed lands; but it also held that alluvial lands formed by accretion along the waters bounding the fractional section became a part of that section and passed along with it under a conveyance referring only to the fractional section. The result was that a conveyance of the fractional section also conveyed the accretion and was not limited to lands landward of the original government surveyed meander line and the fractional section continued to front on the waters of the Gulf of Mexico and the owner of the fractional section continued to be a riparian owner. In the case of St. Paul & Pacific R. Co. v. Schurmeir, 74 U.S. 272, 19 L.Ed. 74, 78 (1868), the United States Supreme Court stated:
Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser.
See also South Florida Farms Co. v. Goodno, 84 Fla. 532, 94 So. 672 (1922). Appellant is confused by the language in Mexico Beach and seems to argue either that no lands exist unless shown as land on the original government survey or that land descriptions are legally insufficient if they are composed by projecting "imaginary survey lines" to locate "nonexistent points" and "corners where no survey had ever been." These arguments while well worded, are patently specious: land was created by God before He created government surveyors and land exists whether or not shown on a government survey and whether or not covered by water at a particular time. The correct rule is that a deed is not void for uncertainty if the description is such as will enable a surveyor to ascertain and locate the land or if it is possible to ascertain and identify the land intended to be conveyed. Mitchell v. Moore, 152 Fla. 843, 13 So.2d 314, 317 (1943). Any competent surveyor can easily comprehend the land intended to be conveyed by the description referring to the northwest quarter of the southwest quarter of the section 18 involved in this case or that part of it described in the particular deed to Contemporary. This is done by the projection of section lines from the nearest full sections *494 to the north, east, south and west of the fractional section and by interpolation of the boundaries thereof to ascertain the theoretical length of the boundaries that would have resulted had the section been surveyed in full and then by usual subdivision of that section into halves, quarter and quarter-quarters. As is common in surveying, even the description above merely assumes that the distance between the southwest and the southeast corner is the theoretical perfect 1320 feet. This results in a most elementary surveying problem. Therefore the property description in the chain of title to Contemporary is legally sufficient and poses no problem in this case.
In view of our conclusion that the Marketable Record Title Act sustains the trial court's judgment in this case, we do not reach appellee's argument that because of the collection of taxes by the county, a political subdivision of the State, the State is equitably estopped to assert title against appellee. See Trustees of Internal Improvement Fund v. Claughton, 86 So.2d 775 (Fla. 1956); Trustees of Internal Improvement Fund v. Bass, 67 So.2d 433 (Fla. 1953); Daniell v. Sherrill, 48 So.2d 736 (Fla. 1950). Nor do we consider appellee's argument that because the State, acting through the water control authority, artificially lowered the waters of Lake Louisa it is estopped to now claim that the present highwater mark of Lake Louisa is not the boundary between Contemporary's privately owned uplands and public owned sovereign lands under navigable water and is further estopped to claim title to the former lake bottom thereby separating Contemporary's uplands from the water and depriving Contemporary of its rights as riparian landowner. See State v. Florida National Properties, Inc., 338 So.2d 13 (Fla. 1976).
The summary judgment is
AFFIRMED.
COBB and FRANK D. UPCHURCH, Jr., JJ., concur.
NOTES
[1] NGVD means National Geodetic Vertical Datum of 1929.
[2] See Vol. III, Fla. Stat. 1941, Whitfield's Notes, at 230.
[3] State ex rel Ellis v. Gerbing, 56 Fla. 603, 615, 47 So. 353, 357 (1908).
[4] Effective June 15, 1978, Ch. 78-288, § 1, Laws of Florida, amended section 712.03, Florida Statutes (1977), adding an exception numbered 7 which provides that the Marketable Record Title Act does not extinguish "state title to lands beneath navigable waters acquired by virtue of sovereignty." It will be readily noted that this exception is patently ambiguous as relating to a case, such as this, involving lands no longer beneath navigable waters. If by this statute the Legislature intended to correct an oversight, not only did the horse in this case escape in the hiatus but the barn door is still ajar.
[5] It should be noted that such sovereignty trust lands have been alienated and have been, and still are, recognized to be alienable. State ex rel Ellis v. Gerbing, 56 Fla. 603, 47 So. 353 (1908). At the general election on November 3, 1970, the people of the State of Florida amended the Constitution of the State of Florida to add an Article X, Section 11, entitled "Sovereignty Lands" which provides as follows:

The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people. Sale of such lands may be authorized by law, but only when in the public interest. Private use of portions of such lands may be authorized by law, but only when not contrary to the public interest.
The Legislature in 1970 (ch. 70-97, Laws of Florida) amended subsection 1 of section 253.12, Florida Statutes (1969), to vest title to "all submerged lands owned by the state by right of its sovereignty in navigable fresh water lakes, rivers and streams" in the Board of Trustees of the Internal Improvement Trust Fund and provided that "submerged lands owned by the state by right of its sovereignty in navigable meandered fresh water lakes shall be administered in accordance with the provisions of section 253.151. Section 253.151(3)(a) defines the boundary of navigable meandered fresh water lakes as being the actual waters edge as of the date the body of water came under the jurisdiction of the state and section 253.151(5) gives the riparian or upland owner an usufructuary right over lands lakeward of the boundary line down to the existing water line.