MAKAR, J.,
dissenting.
At issue are modifications to an original deed conveying uplands and sovereignty *1155 submerged lands to the City of Miami in 1949, the State of Florida retaining ,a- re-versionary interest in the island property, which was restricted to only public purposes. The plaintiffs seek to challenge the modifications, which now allow extensive private uses of the property including submerged lands, but the defendant, the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida, dismissed their complaint with prejudice. The crux of • the matter is whether the plaintiffs have sufficiently pled a claim that entitles them to a hearing before an administrative law judge.
In 1919, the. State deeded to the City an islet that surfaced from the dredged sand and construction debris of a new county bridge connecting the mainland to its barrier islands. Aptly named Causeway Island, it was later rechristened Watson Island to honor Miami Mayor John Watson, Jr. The island is the first stop along the bridge, renamed MacArthur Causeway in 1942, as it snakes eastward across Biscayne Bay toward the Atlantic Ocean. Though at the time scarcely more than a massive artificial sand bar, ⅛ eventually would become home to a,number of the area’s recreational, cultural, and commercial ventures, including the airbase of the Goodyear blimp for almost fifty years (see Appendix A).
The property proved to be a hot potato. In the 1940s, the City deeded the island back to the State, which in turn deeded it back to the City. The latter deed, signed in 1949 by Governor-Fuller Warren and cabinet members, is the key document at issue in this case. Conveyed were both the uplands of Watson Island as well as specified adjoining submerged . sovereignty lands (see Appendix B); it also placed substantial restrictions on uses of the property, allowing public/municipal usés and prohibiting private uses/purposes;,
PROVIDED, HOWEVER, anything herein to the contrary notwithstanding, this deed is given and granted upon the express condition, subsequent that the [City] or its .successors and assigns shall never sell or convey or lease the above described land or any part therefor to any private person, firm or corporation for any private use or-purpose, it being the intention of this restriction that the said lands shall be used solely for public purposes, including municipal purposes and not otherwise.
PROVIDED, FURTHER, anything herein to the contrary notwithstanding, this deed is given and granted upon the further express condition subsequent that the [City] or its successors or assigns shall not give or grant any license or permit to any private person, firm or corporation to construct or make by any means, any islands, fills, embankments, structures, buildings or other similar things within or upon the. above described, lands or any part thereof for any private use or purpose, as distinguished from, any public or municipal use or purpose.
(Emphasis added). - As indicated, construction of any structures, buildings, fills, and so on for a private use or purpose was expressly prohibited. The deed contains a reverter clause, which immediately followed these restrictions, stating: “It is covenanted and agreed that the above conditions subsequent shall run with the land and any. violation thereof shall render this deed null and void and the above-described lands shall, in any event, revert to the [State] or [its] successors.” (Emphasis added).
Around 2004, a few years before economic hard times befell the country, the City partnered with a private company to develop part of the island and a dozen or so acres of the submerged lands for a *1156 mega-yacht marina, two massive hotels, and immense space for retailers (not to mention a marine museum and a fish market). The State agreed to modify the deed restrictions to allow this project, sharing in the projected revenues of the venture, but delays and other setbacks shelved the project. Almost a decade from its inception, the project — phoenix-like—rose again after the City and Board agreed to renewed deed modifications in 2014.
In response, a group of homeowners on a neighboring island timely filed an administrative petition asserting that the Board’s modifications of the deed restrictions, allowing for broad-ranging private commercial activities previously prohibited, may be challenged administratively as affecting uses of sovereignty submerged lands. See Fla. Admin. Code Ann. R. 18-21.004 (2016) (setting forth “management policies, standards, and criteria” that “shall be used in determining whether to approve, approve with conditions or modifications, or deny all requests for activities on sovereignty submerged lands.... ”). Plaintiffs seek administrative remedies, but also want to create a factual record for a constitutional claim based on the public trust doctrine, upon which an article V court can rule.
In its dismissal order, the Board ruled that the submerged portion of the property was no longer sovereignty submerged lands, losing that status upon its conveyance to the City in 1949, which the Board viewed as an alienation of its entire sovereignty interest under article X, section 11, of the Florida Constitution (describing “Sovereignty Lands” as the “lands under navigable waters, within the boundaries of the state, which have not been alienated — ”). As such, the Board’s approval of the modifications “was not an action governed by the provisions of Chapter 18-21, F.A.C., which deals exclusively with the administration of sovereignty submerged lands.” It also concluded that the deed restrictions and possibility of reverter gave the State only “a distant proprietary right” and that the Board’s modifications of the restrictions were a “purely proprietary function” not subject to administrative review. Because the 2014 deed modifications were “the exercise of a minor and purely propriety right that existed because of the conveyance and alienation of Watson Island and surrounding submerged land” in 1949, they were not subject to administrative review. For related reasons, the Board also concluded that the property owners lacked standing.
On appeal, the property owners say the 1949 conveyance of the sovereignty submerged lands does not abdicate the Board’s responsibility to continue to treat the submerged property as subject to the legal requirements for such lands under the administrative code. They view the State as retaining a sufficient legal interest in the conveyed submerged lands to allow for their administrative challenge; to deny them this opportunity would allow the State to convey sovereignty submerged lands, violate restrictions placed upon them, and provide no recourse for persons or entities adversely affected. The Board recognizes the State’s reversionary interest in the Watson Island property, and that the Board may sue to enforce the deed restrictions and, in extremis, take back the property. It also recognizes that proprietaiy decisions may be subject to the APA and that it can be forced to comply with rules it has promulgated by someone with standing. The Board, however, disclaims any authority over the submerged lands conveyed via the 1949 deed. Though acknowledging that its authority includes review of uses or projects affecting sovereignty submerged lands (such as building docks and bridges), the Board views the Watson Island property as re *1157 taining no sovereignty submerged lands, thereby ending the matter.
To begin, what property interest, if any, does the State have in Watson Island’s submerged lands? The Board’s disclaimer of any ongoing legal interest or enforcement authority over the submerged lands is a double-edged sword, one edge potentially foreclosing the type of administrative challenged presented here, the other potentially foreclosing the State’s exercise of its authority over submerged lands held in private or non-state hands. As an initial matter, it is not clear that the property was fully “alienated” by the 1949 deed because the State retains an interest in its reversion if public use restrictions are violated. Unlike property sold unconditionally in fee simple, the conveyance here cannot be said to have entirely alienated the State’s interest in the property due to the potential for its reversion. On this point, it appears that the State retains an interest to some degree in submerged state lands conveyed to private owners. For example, the Second District recently observed that simply because state submerged lands are conveyed into private hands does not entirely extinguish the State’s right to oversee their use, saying that “though it is apparent the authority to control and manage submerged lands is restricted by the public trust doctrine, we do not believe that such authority can be stripped from the State even if the submerged land becomes privately owned.” 5F, LLC v. Dresing, 142 So.3d 936, 946 (Fla. 2d DCA 2014) (emphasis added).[1] That is so even in the “increasingly rare” situations where the “submerged land under navigable water has been or will he dredged and filled to create upland.” Id. The court recognized that a “common thread” in the caselaw is “that the rights of the public are superior to those of private landowners — whether riparian owners or submerged land owners.” Id.
As such, a viable legal theory is that governmental action may, in some limited circumstances, provide those who are substantially affected with the right to seek administrative review by challenging activities on state submerged lands now held by third parties. On the record presented, it appears that the conveyed submerged lands abutting Watson Island remained submerged at the time of the plaintiffs’ petition (see Appendix B — portion of property labeled “Submerged Parcel”); at what stage dredge and fill activities may be taking place was not known at oral argument. And we aren’t told what uses were made of the submerged lands from 1949 until the presént day. Nonetheless, at least facially it appears that the plaintiffs havé alleged a sufficient legal theory based on the proposed change in use of the still-submerged lands. Of course, submerged lands that are conveyed into private hands and then improved do not necessarily *1158 transgress the public trust doctrine; the test is “if the grant of sovereignty land to private parties is of such nature and extent as not to substantially impair the interest of the public in the remaining lands and waters it will not violate the inalienable trust doctrine.” Holland v. Fort Pierce Fin. & Constr. Co., 157 Fla. 649, 27 So.2d 76, 81 (1946). Moreover, this appears to be one of .those “increasingly'rare” situations where dredge and fill activities may be converting state submerged lands into uplands for private uses, which has become less common than, earlier in the State’s history before the environmental movement. 5F, LLC, 142 So.3d at 946.
Turning to the main point, the 1949 grant was a very limited one, restricting the uses of Watson Island to only public, non-private uses with a threat of reverter. It stands to reason that if modifications to those, restrictions have a significant and direct effect on the legally-recognized interests of affected property owners, they may be subject to some degree of administrative and ultimately judicial review.. If that is the case, whether the modifications are proprietary or regulatory comes into play, the latter being subject to Florida’s administrative procedures act, the former less clear in this regard. Sexton v. Bd. of Trs. of Internal Imp. Trust Fund of State of Fla., 101 So.3d 946, 948 (Fla. 1st DCA 2012) (Makar, J., concurring) (“While the caselaw holds that the APA applies when the Board is acting in its regulatory capacity, ... it is less than clear in defining the circumstances when the exercise of proprietary powers subjects the Board to the APA procedures.”); see State, Bd. of Trs. of Internal Imp. Trust Fund v. Lost Tree Vill. Corp., 600 So.2d 1240, 1243 (Fla. 1st DCA 1992) (“Although the Board, acting in its proprietary capacity as owner of sovereign submerged lands, ⅛ different from other state agencies acting in a regulatory capacity,’... the policies underlying the public trust doctrine do not of themselves exempt the Board from the operation, of the APA.”) (citation omitted).
The Board says’ the challenged modifications to the deed restrictions were “the exercise of a minor and purely propriety right” and that the State’s “only interest is a distant proprietary role completely separate, and disconnected from any rulemak-ing or other action subject to the jurisdiction of the APA.” But unlike a discrete and limited grant of an easement to allow for the construction or maintenance of a bridge, pier, or dock over or on submerged lands, see Sexton, the modifications of the restrictions to the original 1949 deed in this case are qualitatively and quantitatively quite different. They dp not facilitate an existing purely proprietary project in a minor way; instead, the Board’s action in modifying the deed restrictions is akin to a major zoning modification that could trigger substantial impacts on the public, i.e., a regulatory action, particularly as to those submerged lands that might be subject to dredge and fill activities not previously authorized (presumably the submerged lands too would be subject to the deed’s use restrictions). Thus, at this earliest stage of this proceeding, it appears that plaintiffs have alleged a viable legal theory for challenging the modifications to the 1949 deed, such that dismissal of plaintiffs’ administrative challenge with prejudice was premature. Washington Cnty. v. Nw. Fla. Water Mgmt. Dist., 85 So.3d 1127, 1130 (Fla. 1st DCA 2012) (concluding that “the District- incorrectly determined it lacked jurisdiction over Appellants’ petitions because the Plan is not subject to administrative challenge”); Ft. Myers Real Estate Holdings, LLC v. Dept of Bus. & Prof'l Reg., Div. of Pari-Mutuel Wagering, 53 So.3d 1158, 1161 (Fla. 1st DCA 2011) (reversing dismissal with prejudice based on “settled principle of admin *1159 istrative law that a person whose substantial interests are determined by an agency is entitled to some kind of hearing — either formal or informal — to challenge the agency’s decision once the agency’s ‘free form’ process is complete”).
Plaintiffs must also have standing. In that regard, what is alleged here is different from mere run-of-the-mill proprietary actions on a minor scale. If deed restrictions originally allowed only a public beach adjoining or a small, one-story public fishing pier over submerged lands, but by deed modification years later the property’s use was transformed into a massive private commercial project of the type alleged, it takes little imagination to envision the potential impacts on those living nearby. Here, the plaintiffs — who reside on adjacent Venetian Causeway a few hundred yards directly north of the project— have alleged some of such impacts, which are the type of special injuries that differ from .those of the public generally. See U.S. Steel Corp. v. Save Sand Key, Inc., 303 So.2d 9 (Fla.1974).
All- this said, the limited issue presented on appeal is whether the plaintiffs are entitled to an administrative proceeding; we are not asked to decide who wins or loses, only whether plaintiffs get a hearing on their legal theory, keeping in mind that at this point they have merely made factual allegations and alleged injuries. Based on their allegations, they have sufficiently pled a preliminary basis to permit them to administratively ■ challenge the Board’s modifications to the 1949 deed.
APPENDIX A
[[Image here]]
“View of causeway from Goodyear Blimp,” Florida Photographic Collection.
*1160 Appendix B
[[Image here]]
CITY OF MIAMI
Biscayne Bay Watson Island

. As the Florida Supreme Court noted over a century ago:
A state may make limited disposition of portions of such lands, or of the use thereof, in the interest of the public welfare, where the rights of the whole people of the state as to navigation and other uses of the waters are not materially impaired. The states cannot abdicate general control over such lands and the waters thereon, since such abdication would be inconsistent with the implied legal duty of the states to preserve and control such lands and the waters thereon and the use of them for the public good.
State v. Gerbing, 56 Fla. 603, 47 So. 353, 355 (1908). This implied legal duty was "codified in article X, section 11, of the Florida Constitution, which recites that “[t]he tide to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people.” 5F, LLC, 142 So.3d at 945.