NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

5F, LLC,                                    )
                                           )
            Appellant,                      )
                                           )
v.                                          )        Case No. 2D13-2793
                                           )
ROBERT DRESING, SARAH F. DRESING )
husband and wife; and NORTHERN             )
TRUST COMPANY, as Trustee for the          )
Michael W. O'Shaughnessy Trust,            )
                                           )
            Appellees.                      )
_____ )

Opinion filed July 16, 2014.

Appeal from the Circuit Court for Lee
County; Keith R. Kyle, Judge.

Jason A. Lessinger and David M. Levin of
Icard, Merrill, Cullis, Timm, Furen &
Ginsburg, P.A., Sarasota, for Appellant.

J. Matthew Belcastro and Harold N. Hume
of Henderson, Franklin, Starnes & Holt,
P.A., Fort Myers, for Appellees.


BLACK, Judge.

        5F, LLC, challenges the order granting final summary judgment in favor of

Robert Dresing, Sarah F. Dresing, and the Northern Trust Company, trustee for the

Michael W. O'Shaughnessy Trust (collectively referred to as the Dresings). The lower

court found that the Dresings, as riparian land owners, have a common law right to construct a pier on submerged land owned by 5F which abuts the Dresings' property and that 5F is collaterally estopped from obtaining relief due to the resolution of prior litigation. Because we conclude that the Dresings' riparian rights include the right to construct a pier upon privately owned submerged lands, we affirm the final summary judgment; however, we conclude that collateral estoppel did not bar 5F's lawsuit.

I.      Background

Mr. and Mrs. Dresing and the Northern Trust Company own adjacent lots extending to the mean high water line[1] in the Boca Grande Isles subdivision in Lee County. The State of Florida originally owned all of the land which became Boca Grande Isles, as well as the submerged lands surrounding Boca Grande Isles. By 1958, 5F's predecessor in title, Sunset Realty Corporation (Sunset), had acquired all of this land from the State.[2] On December 16, 2010, the submerged land involved in this case was conveyed to FFF, LLC, and subsequently, on June 9, 2011, to 5F.

---

[1]"The boundary between public lands and private uplands is the [mean high water line], which represents an average over a nineteen-year period." Walton Cnty. v. Stop the Beach Renourishment, Inc., 998 So. 2d 1102, 1113 (Fla. 2008) (citing Kruse v. Grokap, Inc., 349 So. 2d 788, 789-90 (Fla. 2d DCA 1977)). As noted by the Walton County court, the nineteen-year period is codified in section 177.27, Florida Statutes (1975). 998 So. 2d at 1113. The mean high water line or ordinary high water mark "is described as 'the point up to which the presence and action of the water is so continuous as to destroy the value of the land for agricultural purposes by preventing the growth of vegetation.' " Bd. of Trs. of the Internal Improvement Trust Fund v. Walker Ranch Gen. P'ship, 496 So. 2d 153, 155 (Fla. 5th DCA 1986) (quoting Tilden v. Smith, 113 So. 708, 712 (Fla. 1927)).

[2]In 1973, Sunset recorded a subdivision plat of Boca Grande Isles in the public records of Lee County and subsequently began selling homesites within the subdivision. In 1989, Sunset recorded a subdivision plat, the Sunset Flats subdivision, of the submerged lands surrounding Boca Grande Isles. However, the land was never filled and remains submerged.

On March 15, 2010, the Dresings obtained the necessary permits from Lee County to construct a pier extending from their property onto the submerged land owned by 5F. Permit revisions were made in October 2010, and construction began thereafter. The completed structure was inspected and approved by Lee County on December 3, 2010. At that time, the submerged lands were owned by FFF; the Dresings made no attempt to obtain consent from FFF to construct the pier, and FFF made no objection to the pier during its construction or thereafter.

Some seven months after construction had been completed, 5F advised the Dresings of its objection to the pier by letter dated July 11, 2011. This notice was followed by a complaint filed on August 6, 2012, wherein 5F sued the Dresings for declaratory relief, ejectment, trespass, and trespass damages. The Dresings filed an answer and affirmative defenses claiming a riparian right to construct the pier, as well as arguing the applicability of the doctrines of collateral estoppel, equitable estoppel, and balancing of the conveniences. Both sides moved for summary judgment. The lower court ruled in favor of the Dresings, finding that as riparian owners[3] they had a common law right to build the pier and also finding that 5F was collaterally estopped from raising its claims due to earlier litigation. This appeal followed.

II. Discussion

---

[3]Technically, " '[t]he term riparian owner applies to waterfront owners along a river or stream, and the term littoral owner applies to waterfront owners abutting an ocean, sea, or lake.' " Walton Cnty., 998 So. 2d at 1105 n.3 (alteration in original) (quoting Bd. of Trs. of the Internal Improvement Trust Fund v. Sand Key Assocs., Ltd., 512 So. 2d 934, 936 (Fla. 1987)). However, to be consistent with the lower court proceedings and common practice in Florida, we will use the term riparian. See Brannon v. Boldt, 958 So. 2d 367, 372 n.3 (Fla. 2d DCA 2007) ("Although the use of 'riparian' in this case is technically incorrect, it is consistent with the accepted usage in Florida cases.").

A.  Riparian rights

    a.  The lower court ruling

There is no dispute in our case that the Dresings own to the high water mark and there is no contention by 5F that the pier in question extends beyond the low water line or interferes with navigation or the public's superior rights to use the water.

In ruling for the Dresings, the lower court cited three Florida Supreme Court cases, <u>Hayes v. Bowman</u>, 91 So. 2d 795 (Fla. 1957), <u>Williams v. Guthrie</u>, 137 So. 682 (Fla. 1931), and <u>Freed v. Miami Beach Pier Corp.</u>, 112 So. 841 (Fla. 1927), for the principle that as a matter of law, the Dresings, as riparian owners, had a common law right to construct the pier at issue.

    b.  The common law

The central issue here is whether the Dresings have a common law right to "wharf out," in this case, to construct a dock or a pier on land that is privately owned by 5F.  We begin by looking to the origin of Florida's riparian rights, the English common law.

> Under the common law of England the crown in its sovereign capacity held the title to the beds of navigable or tide waters, including the shore or the space between high and low water marks, in trust for the people of the realm who had rights of navigation, commerce, fishing, bathing, and other easements allowed by law in the waters.  This rule of the common law was applicable in the English colonies of America.
>
> After the Revolution resulting in the independence of the American states, title to the beds of all waters, navigable in fact, whether tide or fresh, was held by the states in which they were located, in trust for all the people of the states respectively.

Brickell v. Trammell, 82 So. 221, 226 (Fla. 1919). When Florida became a state, it was admitted "on equal footing with the original states." Id. That is, title to all submerged land in Florida rested with the State of Florida, and "[t]he shore or space between high and low water mark is a part of the bed of navigable waters, the title to which is in the state in trust for the public." Ferry Pass Inspectors' & Shippers' Ass'n v. White's River Inspectors' & Shippers' Ass'n, 48 So. 643, 644 (Fla. 1909). Riparian holders were defined, at common law, as "those who own land extending to [the] ordinary high-water mark of navigable waters."[4] Brickell, 82 So. at 227. And "[r]iparian rights are incident to the ownership of lands contiguous to and bordering on navigable waters." Ferry Pass, 48 So. at 644.

> Among the common-law rights of those who own land bordering on navigable waters apart from rights of alluvion and dereliction are the right of access to the water from the land for navigation and other purposes expressed or implied by law, the right to a reasonable use of the water for domestic purposes, the right to the flow of the water without serious interruption by upper [or] lower riparian owners or others, the right to have the water kept free from pollution, the right to protect the abutting property from trespass and from injury by the improper use of the water for navigation or other purposes, the right to prevent obstruction to navigation or an unlawful use of the water or of the shore or bed that specially injures the riparian owner in the use of his property, the right to use the water in common with the public for navigation, fishing, and other purposes in which the public has an interest.

---

[4]It is of no consequence that the pier wharfs out into shallow water. See Martin v. Busch, 112 So. 274, 283 (Fla. 1927) ("The navigable waters include lakes, rivers, bays, or harbors, and all waters capable of practical navigation for useful purposes, whether affected by tides or not, and whether the water is navigable or not in all its parts towards the outside lines or elsewhere, or whether the waters are navigable during the entire year or not."); Broward v. Mabry, 50 So. 826, 831 (Fla. 1909) (noting that the shallow body of water in question is navigable even though it goes dry at times and can only be navigated by small boats).

Id. at 644-45.

As to a riparian owner's right to build piers or wharves specifically, the supreme court stated:

> Subject to the superior rights of the public as to navigation and commerce, and to the concurrent rights of the public as to fishing and bathing and the like, a riparian owner may erect upon the bed and shores adjacent to his riparian holdings bath houses, wharves, or other structures to facilitate his business or pleasure; but these privileges are subject to the rights of the public to be enforced by proper public authority or by individuals who are specially and unlawfully injured.

Id. at 645.

Further, "[t]he exclusive rights of a riparian owner are such as are necessary for the use and enjoyment of his abutting property and the business lawfully conducted thereon; and these rights may not be so exercised as to injure others in their lawful rights." Id.

c. Florida Supreme Court decisions

In the 1909 decision in Ferry Pass, the Florida Supreme Court set forth in detail the common law rights of riparian owners. It specifically included, as a privilege or qualified right, inferior to the rights of the public as to navigation and commerce but concurrent in other aspects, the benefit of building "wharves, or other structures to facilitate his business or pleasure." 48 So. at 645. The supreme court has consistently affirmed the language of Ferry Pass, with some clarification and limitation usually relevant to the applicable law at the time of the case or to a particular set of facts. For example, subsequent to its decision in Ferry Pass, the court in Thiesen v. Gulf, Florida & Alabama Railway Co., 78 So. 491, 501 (Fla. 1917), reh'g granted, (1918), considered

both whether riparian owners whose lots did not extend to the low water mark had the right to "wharf out"—"to construct wharves, docks, and piers"—beyond the low water mark "out into the bay to the channel" pursuant to the Riparian Act of 1856,[5] as well as whether those riparian owners had a common law right to "wharf out" beyond the low water mark, "out into the bay to the channel."

In Thiesen, a riparian owner whose lot extended only to the high water mark sued a railroad company claiming that the railroad company had deprived him of his riparian rights by filling in the submerged land in front of his property and constructing tracks thereon. Mr. Thiesen asserted that the railroad company's actions interfered with his rights of access, ingress and egress, and his right to construct wharves from his property to the low water mark and into the channel of the Pensacola Bay. The narrow question before the court involved construction of wharves "beyond the low-water mark to the channel," id. at 502, under both the Riparian Act of 1856 and common law where the riparian owner's title extended only to the high water mark.

---

[5]Shortly after Florida became a state, the Florida Legislature enacted the Riparian Act of 1856. See ch. 791, Laws of Fla. (1856). This act "granted to such riparian owners whose lots extended to [the] low-water mark the right to build wharves into streams or waters of the bay or harbor as far as may be necessary for facilitating the landing of goods." Thiesen, 78 So. at 501. In 1921, the Riparian Act of 1856 was replaced by the Butler Act, see ch. 8537, Laws of Fla. (1921) (repealed 1957), which, just like its predecessor, "divested the State of Florida of fee simple title to submerged lands upon which upland owners constructed certain improvements in the interest of encouraging commerce by developing waterfront property." City of West Palm Beach v. Bd. of Trs. of the Internal Improvement Trust Fund, 746 So. 2d 1085, 1086 (Fla. 1999). "The Butler Act was expressly repealed by the Bulkhead Act of 1957, which vested title to all submerged lands in the trustees of the Internal Improvement Fund." City of West Palm Beach v. Bd. of Trs. of the Internal Improvement Trust Fund, 714 So. 2d 1060, 1061 (Fla. 4th DCA 1998) (citing ch. 57-362 § 1, Laws of Fla. (codified at § 253.12, Fla. Stat. (1997)), aff'd, 746 So. 2d 1085 (Fla. 1999).

After determining that the Riparian Act of 1856 was inapplicable to Mr. Thiesen because his title did not include the land between the high water mark and the low water mark, the court determined that the common law did not afford Mr. Thiesen the right to construct wharves "out into the bay to the channel" beyond the low water mark.  Id.  In so holding, the supreme court quoted with approval the language of Ferry Pass that a " 'riparian owner may erect upon the bed and shores adjacent to his riparian holdings bathhouses, wharves, or other structures to facilitate his business or pleasure,' " subject to the superior or concurrent rights of the public.  Id. at 502-03 (quoting Ferry Pass, 48 So. at 645).  It also quoted with approval the language of a United States Supreme Court decision discussing the construction of wharves by riparian owners whose land bordered navigable streams.  In Yates v. City of Milwaukee, 77 U.S. 497, 504 (1870), Justice Miller, writing for the Court, stated that a riparian owner has "the right to make a landing, wharf or pier for his own use or for the use of the public, subject to such general rules and regulations as the legislature may see proper to impose for the protection of the rights of the public, whatever those may be."

Ten years after the Thiesen decision, the supreme court considered a dispute between adjacent riparian owners in Freed, 112 So. 841.  There the appellee pier corporation constructed a pier that encroached upon the submerged land in front of Mr. and Mrs. Freed's property.  The submerged land was owned by the State.  Since the pier was constructed pursuant to the proper authority and the Freeds were on notice of the construction but only took legal action after construction had begun and large sums of money had been expended, the supreme court denied the Freeds' request for

an injunction.[6]  Id. at 844-45.  In ruling for the corporation, the supreme court, citing both

Ferry Pass and Thiesen, recognized a "qualified right" to "erect wharves or piers or

docks in front of the riparian holdings to facilitate access to and the use of the navigable

waters, subject to lawful state regulation and to the dominant powers of Congress."  Id.

(citations omitted).

In Williams, a 1931 decision, the supreme court yet again confirmed the

riparian right to erect piers and wharves, stating, "in this state riparian owners have the

riparian right to construct wharves from the upland to reach the navigable water, when

not objected to by the sovereign or specially forbidden by statute."  137 So. at 685; see

also Game & Fresh Water Fish Comm'n v. Lake Islands, Ltd., 407 So. 2d 189, 191 (Fla.

1981) (reaffirming the riparian rights set forth in Ferry Pass); Adams v. Elliott, 174 So.

731, 733 (Fla. 1937) ("Riparian or littoral upland owners may construct appropriate piers

or whar[ves] over and across the beach to reach the water for authorized purposes . . .

.), overruled on other grounds by Brown v. State, 237 So. 2d 129 (Fla. 1970).  The

riparian privilege or right is qualified not only by the necessity of obtaining a license from

the State but by the predominant rights of the public in navigable waters such that "even

when the title [to submerged lands] is in private parties a recovery of possession is

subject to the rights of the public in the waters."  Williams, 137 So. at 684-85 (citing

---

[6]Just as the supreme court in Freed admonished the adjacent riparian
owners for failing to take legal action until construction had begun and money
expended, 5F and its predecessors in title are deserving of reproach for failing to object
to the pier prior to its completion.  "[A]ny substantial encroachment upon the rights of
others may be remedied by timely and appropriate procedure in due course of law at
the instance of proper parties, but the rights of individuals to remedy may be waived by
undue delay or laches in seeking a remedy."  Freed, 112 So. at 845.

Bass v. Ramos, 50 So. 945, 948 (Fla. 1909) (recognizing that submerged lands are held in trust for the public)).

Although it did not involve the building of wharves or piers, the 1957 Hayes decision is of particular importance given the facts of our case because Hayes involved the interplay of riparian rights and the rights of the owners of privately held submerged lands.

The Hayeses and the Abbotts (submerged landowners) acquired submerged land from the State, dredged and filled it, and built a peninsular subdivision with "fingers" or smaller peninsulas extending from the main peninsula. Thus, a number of the lots were surrounded by navigable water, Boca Ciega Cay. The submerged landowners subsequently acquired additional submerged lands surrounding the lots and proposed to dredge and fill that land. Three riparian owners filed suit to enjoin the filling, claiming that filling would interfere with their common law riparian right to an unobstructed view of the bay and the right of ingress and egress to the channel. Hayes, 91 So. 2d at 798. The supreme court ruled in favor of the submerged landowners. Id. at 801. However, the court recognized that "any person acquiring any such [submerged] lands from the State must so use the land as not to interfere with the recognized common law riparian rights of upland owners (an unobstructed view, ingress and egress over the foreshore from and to the water)." Id. at 799 (citations omitted). Although it did not expressly include wharfing out or constructing piers, it is clear that the court considered riparian rights superior to those of the submerged landowner— "riparian rights . . . must be preserved over an area 'as near as practicable' in the direction of the Channel . . . ." Id. at 802. Moreover, the court ruminated upon the more

complex problems that the sale of submerged lands to private entities would cause in the future, concluding that submerged lands "must be administered with due regard to the limitations of the trust with which they are impressed." Id. at 800 (citations omitted).

In Belvedere Development Corp. v. Department of Transportation, 476 So. 2d 649 (Fla. 1985) (Belvedere II), although it quashed the Fourth District's opinion in Belvedere Development Corp. v. Department of Transportation, 413 So. 2d 847 (Fla. 4th DCA 1982) (Belvedere I), the supreme court quoted with approval the special concurrence of Judge Hersey that riparian owners have the right, among others, " 'to wharf out to navigability.' " Belvedere II, 476 So. 2d at 651 (quoting Belvedere I, 413 So. 2d at 851 (Hersey, J., concurring)).  This language has subsequently been relied upon by the Fourth District in multiple opinions.  See Bd. of Comm'rs of Jupiter Inlet Dist. v. Thibadeau, 956 So. 2d 529, 534 (Fla. 4th DCA 2007); Shore Vill. Prop. Owners' Ass'n, Inc. v. Fla. Dep't of Envtl. Prot., 824 So. 2d 208, 211 (Fla. 4th DCA 2002); Tewksbury v. City of Deerfield Beach, 763 So. 2d 1071, 1071 (Fla. 4th DCA 1999).

As recently as 2008, the Florida Supreme Court had occasion to list the common law riparian rights and identified them as "(1) the right to have access to the water; (2) the right to reasonably use the water; (3) the right to accretion and reliction; and (4) the right to unobstructed view of the water." Walton Cnty. v. Stop the Beach Renourishment, Inc., 998 So. 2d 1102, 1111 (Fla. 2008), aff'd, Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. 702 (2010).  Importantly, the supreme court cited those portions of Belvedere II and Ferry Pass identifying the right to erect wharves or piers for those enumerated rights.  In short, there is extensive

- 11 -

supreme court authority establishing the riparian right to "wharf out," at least to the low water line, subject only to the public trust.

   d.  District court opinions

   We find further support for the conclusion that common law riparian rights include the qualified right to build a pier or wharf in decisions from our district as well as the Fourth District.

   In Brannon v. Boldt, 958 So. 2d 367 (Fla. 2d DCA 2007) (en banc), this court addressed a dispute between a servient estate, the riparian owner, and the dominant estate, upland owners, over implied easement rights.  Although not specific to the construction of a pier, building upon Cartish v. Soper, 157 So. 2d 150 (Fla. 2d DCA 1963),[7] this court found that the implied easement would have included the right to build a dock from the riparian owner's land over which the easement existed "if otherwise permitted by law."  Brannon, 958 So. 2d at 374.  Quite clearly, a dominant estate holder cannot obtain rights that the servient estate holder does not possess.  Thus, in order for the implied easement to have included the right "to apply for a permit to place a dock on the" easement, the riparian owner must also have possessed that right.  See id. at 373.

   This court's statement is in accord with the Freed decision wherein the supreme court recognized a "qualified right" to "erect wharves or piers or docks in front

_____

   [7]The Cartish decision, relied upon in Brannon, involved a dispute between upland owners concerning the scope of an easement and whether the easement included a right to rebuild a previously existing dock.  This court determined that riparian rights were implied as part of the easement allowing for ingress and egress from the bay.  157 So. 2d at 153.  See also Shore Village, 824 So. 2d at 210-11 (citing Cartish in concluding that easement included riparian rights, particularly the right to "wharf out to navigability").  As such, this court concluded that the right to rebuild the dock to facilitate access to the bay was implied in the easement.  Cartish, 157 So. 2d at 153-54.

- 12 -

of the riparian holdings to facilitate access to and the use of the navigable waters, subject to lawful state regulation and to the dominant powers of Congress."  112 So. at 844-45.  And, as we did in Brannon, we reiterate that the privilege or qualified right to construct a pier "is apparently illusory" until such time as the riparian owner complies with the applicable regulations, including zoning and environmental controls put in place as part of the public trust doctrine.  958 So. 2d at 373.  See also Op. Att'y Gen. Fla. 96-49 (1996) ("Subject to applicable regulations and permitting procedures, the owner of riparian property may construct and maintain a wharf, dock, or pier from his or her land to the navigable portion of adjoining waters.").

In Board of Trustees of the Internal Improvement Trust Fund v. Medeira Beach Nominee, Inc., 272 So. 2d 209 (Fla. 2d DCA 1973), a case addressing title to accreted lands as between the Board of Trustees and the riparian owner, this court expressly recognized a "qualified common law right to wharf out to navigable waters in the absence of a statute."  Id. at 214 (citing Freed, 112 So. 841; Williams, 137 So. 682).[8]  The Medeira Beach decision also recognizes the public trust doctrine and the impact of governmental regulation on the rights of the public and riparian owners.

The Fourth District has three times expressly stated that riparian rights in Florida include the right "to wharf out to navigability."  In Shore Village the court addressed "whether riparian rights necessarily include the building of a dock."  824 So.

---

[8]See also Op. Att'y Gen. Fla. 96-49 (1996) (citing Freed and Ferry Pass as authority for the conclusion that "riparian property owners in Florida have a qualified right to build docks or 'wharf out' to navigable water and have exclusive rights to use their private property"); Op. Att'y Gen. Fla. 90-37 (1990) (citing Freed and Medeira Beach for the conclusion that "riparian property owners in Florida have a qualified right to build docks or 'wharf out' to navigable water in the absence of a statute").

2d at 211. Citing its previous decision in <u>Tewksbury</u>, 763 So. 2d at 1071, and the supreme court's <u>Belvedere II</u> decision, 476 So. 2d at 651, the Fourth District concluded that "riparian rights include the building of a dock to have access to navigable waters." <u>Shore Village</u>, 824 So. 2d at 211; <u>see also</u> <u>Thibadeau</u>, 956 So. 2d at 534.

e. Sovereign submerged lands v. Privately held submerged lands

It is important to reaffirm the issue presented in this appeal, which is whether the Dresings have an affirmative right to construct the pier and not what rights 5F may have. 5F argues that no right to wharf out at common law exists, or at best, that it can prevent the Dresings from exercising their right. In this regard it is important to consider on what basis the State could prevent the Dresings from erecting a pier if the submerged lands were still held in trust by the State, or perhaps more accurately, by the Board of Trustees of the Internal Improvement Trust Fund (Trustees).

The public trust doctrine was codified in article X, section 11, of the Florida Constitution, which recites that "[t]he title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people." Thus, the State did not hold title to submerged lands "for purposes of sale or conversion into money." <u>Hayes</u>, 91 So. 2d at 799. Rather, such lands are "trust property and should be devoted to the fulfillment of the purposes of the trust, towit [sic]: the service of the people." <u>Id.</u> As noted previously, pursuant to the Bulkhead Act of 1957, title to all sovereign submerged land was vested in the Trustees. The Trustees were thus "vested with the power and duty to manage and control sovereignty lands." <u>Mariner Props. Dev., Inc. v. Bd. of Trs. of the Internal Improvement Trust Fund</u>, 743 So.

2d 1121, 1122 (Fla. 1st DCA 1999) (citing § 253.03, Fla. Stat.).  However, "[c]onsistent with article X, section 11, of the Florida Constitution, [submerged lands] are held by the Board [of Trustees] as a public trust and the Board [of Trustees'] authority is <u>rigidly circumscribed by this common law doctrine</u>."  <u>Id.</u> (emphasis added).

In <u>Krieter v. Chiles</u>, 595 So. 2d 111 (Fla. 3d DCA 1992), a riparian owner was denied permission by the Trustees to construct a dock on submerged land in a park held in trust by the Trustees.  The court recognized that the riparian owner's right of ingress and egress by wharfing out was a qualified right, citing <u>Ferry Pass</u>, and as such, the Trustees had the authority to prohibit its construction because it was in the public interest to do so.  <u>Id.</u> at 112-13 (citing <u>Graham v. Edwards</u>, 472 So. 2d 803, 807 (Fla. 3d DCA 1985)); <u>see also</u> <u>Hayes</u>, 91 So. 2d at 799 ("[T]he State may dispose of submerged lands under tidal waters to the extent that such disposition will not interfere with the public's right of navigation, swimming and like uses.  Moreover, any person acquiring any such lands from the State must so use the land as not to interfere with the recognized common law riparian rights of upland owners (an unobstructed view, ingress and egress over the foreshore from and to the water).").  Certainly any authority obtained by 5F's predecessors in interest and thereafter 5F would also be so restricted by the public trust doctrine.  And even if the pier in question was constructed in contravention of the public trust, 5F has not asserted such argument.  Further, the permits obtained by the Dresings suggest otherwise.  <u>Cf.</u> <u>Burns v. Wiseheart</u>, 205 So. 2d 708, 710 (Fla. 1st DCA 1968).

However, it has not escaped this court's attention that only a few of the foregoing cases concerned riparian rights and privately owned submerged land—

- 15 -

Thiesen, Hayes, and Tewksbury. Along with the fact that Thiesen addressed the narrow legal issue of wharfing out beyond the low water mark, an issue not before this court, both Thiesen and Hayes presented a set of facts which are increasingly rare—the applicability of riparian rights where submerged land under navigable water has been or will be dredged and filled to create upland. As noted previously, Sunset did in fact record a subdivision plat of the submerged land in 1989. However, the dredging and filling of land is no longer a commonly accepted practice. See F. Maloney, S. Plager, R. Ausness, B. Canter, Florida Water Law 460-62 (1980) (noting that pursuant to the Bulkhead Act, dredging and filling activities became heavily regulated and the sale of submerged lands was permitted only in the public interest with ecological considerations in mind; the public's awareness of environmental issues also increased in the late 1960s and early 1970s).

The Tewksbury decision addressed privately owned submerged lands and the scope of a riparian owner's right to erect a dock, specifically whether that right included the operation of an outdoor dining area on the dock. 763 So. 2d at 1071. And although the court noted that "[t]he fact that this case concerns privately-owned submerged land as opposed to sovereign lands owned by the State of Florida makes it somewhat unique," 763 So. 2d at 1071 n.1, the court did not consider that a factor in determining the scope of the riparian owner's right "to wharf out to navigability," id. at 1071-72. Neither do we.

Moreover, all of the aforementioned cases illustrate a common thread: that the rights of the public are superior to those of private landowners—whether riparian

- 16 -

owners or submerged land owners. This is one indicium of the uniqueness of riparian rights. As the supreme court has stated,

> [a]lthough riparian rights are property, they are unique in character. The source of those rights is not found within the interest itself, but rather they are found in, and are defined in terms of the riparian upland. In most cases, therefore, it is not difficult to find that riparian rights are an inherent aspect of upland ownership and are not severable from it.

Belvedere II, 476 So. 2d at 652. With regard to submerged lands like other property, "the law recognizes various degrees of legal rights and interests in the same property and does not demand that one person hold the entire 'bundle of sticks.' " Coastal Petroleum Co. v. Am. Cyanamid Co., 492 So. 2d 339, 348 (Fla. 1986).

Finally, though it is apparent the authority to control and manage submerged lands is restricted by the public trust doctrine, we do not believe that such authority can be stripped from the State even if the submerged land becomes privately owned. See State ex rel. Ellis v. Gerbing, 47 So. 353, 355 (Fla. 1908) ("A state may make limited disposition of portions of such lands, or of the use thereof, in the interest of the public welfare, where the rights of the whole people of the state as to navigation and other uses of the waters are not materially impaired. The states cannot abdicate general control over such lands and the waters thereon, since such abdication would be inconsistent with the implied legal duty of the states to preserve and control such lands and the waters thereon and the use of them for the public good.").

f.  Conclusion

We conclude there is a common law qualified riparian right or privilege to construct piers or wharves from the riparian owner's land onto submerged land to the point of navigability but not beyond the low water line, subject to the superior and concurrent rights of the public and to applicable regulations.  This is true regardless of whether the submerged lands are held in trust by the State or privately held.

B.  Collateral Estoppel

In addition to finding a common law right to erect a pier or wharf, the lower court also found that 5F's claims were barred by application of the collateral estoppel doctrine based upon two circuit court cases involving 5F's predecessor in title, Sunset. The outcomes of both cases were adverse to Sunset.[9]  Though it is undisputed that these prior lawsuits involved the same subdivision and effectively the same owner of the submerged lands since Sunset was the predecessor in title to the submerged lands, it is also undisputed that the Dresings were not parties to either of the prior actions and were not in privity with any party that was.

As the Florida Supreme Court has made clear, there must "be mutuality of parties in order for collateral estoppel to apply defensively."  E.C. v. Katz, 731 So. 2d 1268, 1270 (Fla. 1999); accord Stogniew v. McQueen, 656 So. 2d 917, 919 (Fla. 1995). Further, this court recently determined that collateral estoppel was inapplicable in a case that did not involve the "relitigation of the same issues by the same parties in a

_____

[9]See Summary Judgment, LeClair v. Stewart, No. 91-8953 CA-WCM (Fla. 20th Cir. Ct. Dec. 22, 1992) (order granting plaintiff's motion for summary judgment against defendants, Robert Stewart and Sunset); Order Granting Defendants' Motion for Summary Judgment, Sunset Realty Corp. v. Boynton, No. 91-3623 CA (Fla. 20th Cir. Ct. May 18, 1992).

- 18 -

different cause of action."  Zakhary v. Raymond Thompson PSM, Inc., 93 So. 3d 1148, 1151 (Fla. 2d DCA 2012); see also Cook v. State, 921 So. 2d 631, 634-35 (Fla. 2d DCA 2005) (explaining the general principles of collateral estoppel including the mutuality of parties requirement).  Though exceptions to the mutuality of parties requirement have been recognized in a few limited circumstances, such as "where special fairness or policy considerations appear to compel it," see West v. Kawasaki Motors Mfg. Corp., U.S.A., 595 So. 2d 92, 94-96 (Fla. 3d DCA 1992), this is not such a case.  In fact,

> the sole exception "in which [the Florida Supreme Court] has not strictly adhered to the requirement of mutuality of parties is Zeidwig [v. Ward, 548 So. 2d 209 (Fla. 1989)]."  In that case, a criminal defendant who had unsuccessfully brought an ineffective assistance of counsel claim in a postconviction proceeding was held to be collaterally estopped from raising the same claim in a legal malpractice action against his former lawyer. . . .  Zeidwig constitutes a "narrow exception" in which collateral estoppel is permitted in a defensive context "and then only under the compelling facts of that case."

E.C., 731 So. 2d at 1269-70 (alteration in original) (quoting Stogniew, 656 So. 2d at 919).

The Second District cases that recognize an exception to the general rule regarding mutuality of parties either involve a significant legal relationship between the party in the prior action and the party asserting collateral estoppel or a mutual interest in the same matter.  In City of New Port Richey v. State ex rel. O'Malley, 145 So. 2d 903, 905 (Fla. 2d DCA 1962), for example, this court applied the doctrine of collateral estoppel determining that there was a "mutuality of interest in the same subject matter." This court noted that in addition to the fact that the parties in both suits were property owners in an area annexed by the city, the issue in both cases involved the same real

- 19 -

property, namely, the annex. An exception to the mutuality of parties requirement was also applied in the three-line opinion in <u>Dixie Auto Transport Co., Inc. v. Louttit</u>, 588 So. 2d 68 (Fla. 2d DCA 1991). However, in recognizing the exception, this court cited <u>Zeidwig</u> and a Third District case, <u>Verhagen v. Arroyo</u>, 552 So. 2d 1162 (Fla. 3d DCA 1989). The Dresings concede that the very narrow exception recognized in <u>Zeidwig</u> is not applicable here. Further, the court in <u>Verhagen</u> expressly found that the defendants in that action were in privity, "for collateral estoppel purposes," with the defendants in the prior action. 552 So. 2d at 1164.

Because we do not have mutuality of parties in this case and there is otherwise no relationship between the Dresings and the prior litigants, collateral estoppel is inapplicable.

III.    Conclusion

Though collateral estoppel does not bar 5F's claims, we affirm the lower court's final summary judgment order to the extent that the court determined that the Dresings, as riparian owners, have a qualified common law right to construct the pier at issue.

Affirmed.


ALTENBERND and KHOUZAM, JJ., Concur.