IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

STEPHEN HERBITS, and 1000
VENETIAN WAY
CONDOMINIUM, INC.,

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

     Appellants,

CASE NO. 1D15-1076
CORRECTED PAGES: pg 24
CORRECTION IS UNDERLINED IN RED
MAILED: June 24, 2016
BY: NMS

v.

BOARD OF TRUSTEES OF
THE INTERNAL
IMPROVEMENT TRUST
FUND,

     Appellee.

_____/

Opinion filed June 24, 2016.

An appeal from an order of the Board of Trustees of the Internal Improvement
Trust Fund.

Samuel J. Dubbin of Dubbin & Kravetz, LLP, Coral Gables; Gary K. Hunter, Jr. and
Timothy M. Riley of Hopping Green & Sams, P.A., Tallahassee, for Appellants.

Craig D. Varn, General Counsel, Sarah M. Doar, Senior Assistant General Counsel,
and Tom B. Adams, III, Assistant General Counsel, Department of Environmental
Protection, Tallahassee, for Appellee.

PER CURIAM.

Appellants, Stephen Herbits and 1000 Venetian Way Condominium, Inc., appeal a Final Order of Dismissal entered by Appellee, the Board of Trustees of the Internal Improvement Trust Fund ("Board"), that dismissed their Second Amended Petition for Formal Administrative Proceedings ("Second Amended Petition"), wherein they sought administrative review of the Board's decision to approve the City of Miami's request for a partial modification of deed restrictions on what was once sovereign submerged land ("SSL"). For the following reasons, we affirm.

In their Second Amended Petition, Appellants alleged the following:

## Background

In 1949, the State of Florida conveyed Watson Island and surrounding submerged land to the City of Miami, more particularly described in Deed No. 19447 . . . for no consideration, and with the requirement that the City could use the property for public and municipal purposes only, specifically excluding any conveyance to a private person, firm, or corporation for any private use or purpose:

PROVIDED, HOWEVER, anything herein to the contrary notwithstanding, this deed is given and granted upon the express condition subsequent that the Grantee herein or its successors and assigns shall never sell or convey or lease the above described land or any part thereof to any private person, firm or corporation for any private use or purpose, it being the intention of this restriction that the said lands shall be used solely for public purposes, including municipal purposes and not otherwise.

PROVIDED, FURTHER, anything herein to the contrary notwithstanding, this deed is given and granted upon the further express condition subsequent that the Grantee herein or its successor or assigns shall not give or grant any license or permit to any private person, firm or

2

corporation to construct or make by any means, any islands, fills, embankments, structures, buildings or other similar things within or upon the above described lands or any part thereof for any private use or purpose, as distinguished from any public or municipal use or purpose.

It is covenanted and agreed that the above conditions shall run with the land and any violation thereof shall render this deed null and void and the above-described lands shall, in any event, revert to the Grantors or their successors.

In 2004, the Board approved a partial modification of the deed restrictions, allowing the City of Miami ("City") to lease the land at issue for a proposed state-of-the-art yacht marina and mixed-use development. In 2011, the Board approved an amended and restated partial modification, which revised the schedule and structure for payments to the Board. This modification automatically terminated in 2012 as a result of four undischarged judgments against the developer. As for the 2014 partial modification at issue in this case, the Board described it as being "previously approved by the Board . . . in 2004." The modification "allow[ed] the construction and operation of a public and private commercial marina and mixed use waterfront development project, including any and all uses permitted under the Ground Lease, to continue which will help the local economy and continue to provide revenue to the state." According to the Board, the modification "in no way waives any regulatory requirements including but not limited to those of DEP, Army Corp of Engineers, South Florida Water Management District, and Miami-Dade

3

County Environmental Resources Management."

In response, Appellants filed a Petition for Formal Administrative Proceedings with the Board, pursuant to sections 120.569 and 120.57, Florida Statutes. Appellants alleged that the Board's approval of the City's request to remove important restrictions would substantially affect them, and they requested that the Board refer the matter to the Division of Administrative Hearings for formal administrative proceedings and that it enter a final order denying the decision to approve the City's modification request.

The Board entered an Order Dismissing Petition with Leave to Amend, finding that the petition "fail[ed] to show that the Petitioners as third parties can challenge a purely proprietary Board action under sections 120.569 and 120.57 Florida Statutes" and "fail[ed] to establish that the Petitioners' substantial interests will be affected by the Board's action . . . ." The Board subsequently dismissed Appellants' First Amended Petition for Formal Administrative Proceedings as well, determining that the amended petition was "based upon the defective premise the land in question is [SSL]," it "[fail]ed to show that the Petitioners as third parties can challenge this minor and purely proprietary Board action under sections 120.569, and 120.57," and it "fail[ed] to establish that the Petitioners' substantial interests will be affected by the Board's action" granting the partial modification.

Thereafter, Appellants filed their Second Amended Petition, the operative

4

petition for purposes of this appeal. They asserted in part as follows:

2. The Department's rationale [for dismissal] is without basis. The challenged action, a modification of the original restrictions concerning a deed over [SSL], is an action taken by the Board concerning the transfer of [SSL]. Such action is circumscribed in the Board's own adopted regulations under Chapter 18-21 . . . . Therefore, the action challenged is subject to review under the Florida APA. The action is not "purely proprietary" as the Board is bound to follow its regulatory mandate under Chapter 18-21 . . . . Finally, Petitioners below detail multiple, independent, serious consequences and harms that will result if the action is approved. Thus, Petitioners have well-pled a substantial interest within the four-corners of the petition, which is the limit of the Department's scope of review on a dismissal. . . .

Basis for Filing First Amended Petition

. . . .

5. More importantly, Petitioners are challenging not simply the Board's proprietary action, but its "administrative and management responsibilities" as circumscribed by its own rules, which it is bound to follow under the APA. R. 18-21.002(1), F.A.C. . . . The Board's action here is bounded by both its proprietary *and* regulatory obligations. Specifically, Rule 18-21.004(1)(a), F.A.C., addresses the Board's regulatory obligation to consider the public's interest when making proprietary decisions concerning activities on sovereignty lands. . . .

In support of their assertion, Appellants cited article X, section 11 of the Florida Constitution, section 253.12(2)(a), Florida Statutes, and Florida Administrative Code Rule 18-21.004(1)(a), all of which pertain to SSL.

In the Final Order of Dismissal, the Board set forth in part as follows:

Defective Premise That The Land in Question Is [SSL]

5

The Petitioners' Second Amended Petition again relies heavily, if not entirely, upon various sections of Chapter 18-21 . . . and the mistaken belief that the property in question is [SSL].

. . . .

Such arguments based upon Chapter 18-21, F.A.C. . . , however, are not persuasive. For the arguments to be valid, the land in question must be [SSL]. As stated under rule 18-21.002(1), F.A.C., titled "Scope and Effective Date":

> These rules are to implement the administrative and management responsibilities of the Board, the Department of Environmental Protection and the Department of Agriculture and Consumer Services regarding [SSL]. . . .
>
> Furthermore, as stated under rule 18-21.003(61), F.A.C.,
>
> "Sovereignty submerged lands" means those lands including but not limited to, tidal lands, islands . . . to which the State of Florida acquired title on March 3, 1845, by virtue of statehood, and which have not been heretofore conveyed or alienated. For the purposes of this chapter [SSL] shall include all submerged lands title to which is held by the Board. (Emphasis added).

As the Petitioners point[] out in their own words on page 6 of the Amended Petition:

> In 1949, the State of Florida conveyed Watson Island and surrounding submerged land to the City of Miami more particularly described in Deed No. 19447 . . . .

When Deed No. 19447 was executed and delivered to the City of Miami in 1949, effectively conveying and alienating Watson Island and surrounding submerged land, the property ceased to be [SSL]. The property become conveyed land in which the State of Florida, through deed restrictions and possibility of reverter only, held a distant proprietary right. Therefore, the action of the Board in approving a Partial Modification of Original Deed Restriction to Deed No. 19447,

6

was not an action governed by the provisions of Chapter 18-21, F.A.C., which deals exclusively with the administration of [SSL]. Also, the Board's action did not deal with any rule making action subject to the APA.

This conclusion is not only supported by the F.A.C., but also the Constitution of the State of Florida . . . . Under Article X, Section 11, Fla. Const., "Sovereignty Lands" are described as follows:

> The title to lands under navigable waters, within the boundaries of the state, <u>which have not been alienated</u> . . . is held by the state . . . .

Therefore, the Board's decision to approve the request from the City of Miami for a Partial Modification of Original Restriction to Deed No. 19447 did not involve rulemaking or action under Chapter 18-21, F.A.C., but instead was the exercise of a minor and purely propriety right that existed because of the conveyance and alienation of Watson Island and surrounding submerged land under Deed No. 19447 in 1949.

Since the Board's action falls outside of Chapter 18-21, F.A.C., and the Petitioners rely heavily on said rule to establish both standing and jurisdiction, the Board must dismiss the Petitioners' Second Amended Petition. In doing so, the Board restates the following concerning standing and jurisdiction.

<u>The Petitioners' Allegations Fail to Implicate Administrative Procedure Act Jurisdiction</u>

. . . (DOAH) does not, by either statutory or constitutional scheme, acquire automatic jurisdiction through the . . . (APA) when the Board takes action that is related to a minor and purely proprietary interest, and does not involve rulemaking, and thus DOAH/APA jurisdiction is not invoked. Furthermore, the Petitioners have not alleged a single applicable chapter or rule of the Florida Administrative Code relative to the Board's action in this situation, or sufficiently, alleged that the Board has exercised rule making authority in relation to its granted authority. The property in question is no longer "sovereign" submerged land, and is no longer owned by the State of Florida. The Board's only interest is a distant proprietary role completely separate, and disconnected from any rulemaking or other action subject to the jurisdiction of the APA.

7

. . . .

> Furthermore, the Petitioners' stated basis for jurisdiction are sections of Chapter 18-21, F.A.C., and the belief that the property in question is [SSL]. These beliefs are misplaced. Thus, the Second Amended Petition does not contain sufficient allegations under established precedent or rule to implicate APA jurisdiction.

The Board further determined that the Second Amended Petition did not contain allegations clearly demonstrating standing. It dismissed the petition with prejudice. This appeal followed.

"In considering the dismissal of a petition for a hearing under section 120.57, Florida Statutes, an agency must 'accept as true the factual allegations of the petitions and may not consider any factual matters outside the amended petitions.'" Save our Creeks v. State of Fla. Fish & Wildlife Conservation Comm'n, 112 So. 3d 128, 130 (Fla. 1st DCA 2013) (citation omitted). Dismissal of such a petition is reviewable de novo. Id.

Appellants argue that the Board dismissed their petition by inventing a new legal standard that would exempt "this" SSL from the requirements of the Florida Constitution. As this argument makes clear, the premise of Appellants' petitions was that the land at issue is SSL. However, as the Board determined, Appellants alleged in all of their petitions that the State "conveyed" by deed Watson Island and surrounding submerged land to the City in 1949. Article X, section 11 of the Florida Constitution, which addresses "[s]overeignty lands," provides:

8

The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people. Sale of such lands may be authorized by law, but only when in the public interest. Private use of portions of such lands may be authorized by law, but only when not contrary to the public interest.

Section 253.12, Florida Statutes (2014), which is entitled "Title to tidal lands vested in state," provides in part in subsection (1) that "[e]xcept submerged lands heretofore conveyed by deed or statute, the title to all sovereignty tidal and submerged bottom lands . . . is vested in the Board . . . ."  Section 253.12(2)(a) provides in part that "[t]he Board . . . may sell and convey such islands and submerged lands if determined by the board to be in the public interest, upon such prices, terms, and conditions as it sees fit."

Florida Administrative Code Rule 18-21.003(61) defines "SSLs" as:

those lands including but not limited to, tidal lands, islands, sand bars, shallow banks, and lands waterward of the ordinary or mean high water line, beneath navigable fresh water or beneath tidally-influenced waters, to which the State of Florida acquired title on March 3, 1845, by virtue of statehood, and which have not been heretofore conveyed or alienated. For the purposes of this chapter **sovereignty submerged lands shall include all submerged lands title to which is held by the Board**.

(Emphasis added).

Based upon the foregoing authorities, we agree with the Board that the land at issue ceased being SSL when it was conveyed or deeded to the City.  Appellants cite to no authority for the proposition that land continues to be SSL if a deed

9

includes use restrictions, and there has been no allegation that the Board, rather than the City, holds title to the land at issue. Nor does the record provide any indication that Appellants have administratively challenged rule 18-21.003(61), which expressly includes "all submerged lands title to which is held by the Board." Although Appellants' desire to administratively challenge the deed modification is understandable, as are the dissent's concerns regarding their ability to do so, both Appellants and the dissent acknowledge that the land at issue was "conveyed" by deed to the City. Yet, none of the foregoing authorities include within the SSL definition SSL that was conveyed by a deed containing restrictions. To read those authorities in the manner proposed by Appellants and accepted by the dissent would entail us improperly adding words to those authorities. See Lawnwood Med. Ctr., Inc. v. Seeger, 990 So. 2d 503, 512 (Fla. 2008) (noting that courts are not at liberty to add words to a statute that were not placed there by the Legislature and that the same tenet applies equally to constitutional provisions); see also Daniels v. Fla. Dep't of Health, 898 So. 2d 61, 64 (Fla. 2005) ("When the statute is clear and unambiguous, courts will not look behind the statute's plain language for legislative intent . . . ."); Overstreet v. State, 629 So. 2d 125, 126 (Fla. 1993) ("If the legislature did not intend the results mandated by the statute's plain language, then the appropriate remedy is for it to amend the statute.").

Accordingly, we AFFIRM the Final Order of Dismissal.

10

LEWIS and B.L. THOMAS, JJ., CONCUR;  MAKAR, J., DISSENTS WITH OPINION.

MAKAR, J., dissenting.

At issue are modifications to an original deed conveying uplands and sovereignty submerged lands to the City of Miami in 1949, the State of Florida retaining a reversionary interest in the island property, which was restricted to only public purposes. The plaintiffs seek to challenge the modifications, which now allow extensive private uses of the property including submerged lands, but the defendant, the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida, dismissed their complaint with prejudice. The crux of the matter is whether the plaintiffs have sufficiently pled a claim that entitles them to a hearing before an administrative law judge.

In 1919, the State deeded to the City an islet that surfaced from the dredged sand and construction debris of a new county bridge connecting the mainland to its barrier islands. Aptly named Causeway Island, it was later rechristened Watson Island to honor Miami Mayor John Watson, Jr. The island is the first stop along the bridge, renamed MacArthur Causeway in 1942, as it snakes eastward across Biscayne Bay toward the Atlantic Ocean. Though at the time scarcely more than a massive artificial sand bar, it eventually would become home to a number of the area's recreational, cultural, and commercial ventures, including the airbase of the Goodyear blimp for almost fifty years (see Appendix A).

The property proved to be a hot potato. In the 1940s, the City deeded the island

12

back to the State, which in turn deeded it back to the City. The latter deed, signed in 1949 by Governor Fuller Warren and cabinet members, is the key document at issue in this case. Conveyed were both the uplands of Watson Island as well as specified adjoining submerged sovereignty lands (see Appendix B); it also placed substantial restrictions on uses of the property, allowing public/municipal uses and prohibiting private uses/purposes:

> PROVIDED, HOWEVER, anything herein to the contrary notwithstanding, this deed is given and granted upon the express condition subsequent that the [City] or its successors and assigns shall never sell or convey or lease the above described land or any part therefor to any private person, firm or corporation for any private use or purpose, it being the intention of this restriction that *the said lands shall be used solely for public purposes, including municipal purposes and not otherwise*.

> PROVIDED, FURTHER, anything herein to the contrary notwithstanding, this deed is given and granted upon the further express condition subsequent that the [City] or its successors or assigns shall not give or grant any license or permit to any private person, firm or corporation to construct or make by any means, any islands, fills, embankments, structures, buildings or other similar things within or upon the above described lands or any part thereof *for any private use or purpose, as distinguished from any public or municipal use or purpose*.

(Emphasis added). As indicated, construction of any structures, buildings, fills, and so on for a private use or purpose was expressly prohibited. The deed contains a reverter clause, which immediately followed these restrictions, stating: "It is covenanted and agreed that the above conditions subsequent shall run with the land and *any violation thereof shall render this deed null and void and the above-*

13

*described lands shall, in any event, revert to the [State] or [its] successors.*" (Emphasis added).

Around 2004, a few years before economic hard times befell the country, the City partnered with a private company to develop part of the island and a dozen or so acres of the submerged lands for a mega-yacht marina, two massive hotels, and immense space for retailers (not to mention a marine museum and a fish market). The State agreed to modify the deed restrictions to allow this project, sharing in the projected revenues of the venture, but delays and other setbacks shelved the project. Almost a decade from its inception, the project—phoenix-like—rose again after the City and Board agreed to renewed deed modifications in 2014.

In response, a group of homeowners on a neighboring island timely filed an administrative petition asserting that the Board's modifications of the deed restrictions, allowing for broad-ranging private commercial activities previously prohibited, may be challenged administratively as affecting uses of sovereignty submerged lands. See Fla. Admin. Code Ann. R. 18-21.004 (2016) (setting forth "management policies, standards, and criteria" that "shall be used in determining whether to approve, approve with conditions or modifications, or deny all requests for activities on sovereignty submerged lands . . . ."). Plaintiffs seek administrative remedies, but also want to create a factual record for a constitutional claim based on the public trust doctrine, upon which an article V court can rule.

14

In its dismissal order, the Board ruled that the submerged portion of the property was no longer sovereignty submerged lands, losing that status upon its conveyance to the City in 1949, which the Board viewed as an alienation of its entire sovereignty interest under article X, section 11, of the Florida Constitution (describing "Sovereignty Lands" as the "lands under navigable waters, within the boundaries of the state, which have not been alienated . . . ."). As such, the Board's approval of the modifications "was not an action governed by the provisions of Chapter 18-21, F.A.C., which deals exclusively with the administration of sovereignty submerged lands." It also concluded that the deed restrictions and possibility of reverter gave the State only "a distant proprietary right" and that the Board's modifications of the restrictions were a "purely proprietary function" not subject to administrative review. Because the 2014 deed modifications were "the exercise of a minor and purely propriety right that existed because of the conveyance and alienation of Watson Island and surrounding submerged land" in 1949, they were not subject to administrative review. For related reasons, the Board also concluded that the property owners lacked standing.

On appeal, the property owners say the 1949 conveyance of the sovereignty submerged lands does not abdicate the Board's responsibility to continue to treat the submerged property as subject to the legal requirements for such lands under the administrative code. They view the State as retaining a sufficient legal interest in the

15

conveyed submerged lands to allow for their administrative challenge; to deny them this opportunity would allow the State to convey sovereignty submerged lands, violate restrictions placed upon them, and provide no recourse for persons or entities adversely affected. The Board recognizes the State's reversionary interest in the Watson Island property, and that the Board may sue to enforce the deed restrictions and, in extremis, take back the property. It also recognizes that proprietary decisions may be subject to the APA and that it can be forced to comply with rules it has promulgated by someone with standing. The Board, however, disclaims any authority over the submerged lands conveyed via the 1949 deed. Though acknowledging that its authority includes review of uses or projects affecting sovereignty submerged lands (such as building docks and bridges), the Board views the Watson Island property as retaining no sovereignty submerged lands, thereby ending the matter.

To begin, what property interest, if any, does the State have in Watson Island's submerged lands? The Board's disclaimer of any ongoing legal interest or enforcement authority over the submerged lands is a double-edged sword, one edge potentially foreclosing the type of administrative challenged presented here, the other potentially foreclosing the State's exercise of its authority over submerged lands held in private or non-state hands. As an initial matter, it is not clear that the property was fully "alienated" by the 1949 deed because the State retains an interest

16

in its reversion if public use restrictions are violated. Unlike property sold unconditionally in fee simple, the conveyance here cannot be said to have entirely alienated the State's interest in the property due to the potential for its reversion. On this point, it appears that the State retains an interest to some degree in submerged state lands conveyed to private owners. For example, the Second District recently observed that simply because state submerged lands are conveyed into private hands does not entirely extinguish the State's right to oversee their use, saying that "though it is apparent the authority to control and manage submerged lands is restricted by the public trust doctrine, we do not believe that such authority can be stripped from the State *even if the submerged land becomes privately owned*." 5F, LLC v. Dresing, 142 So. 3d 936, 946 (Fla. 2d DCA 2014) (emphasis added).[1] That is so even in the "increasingly rare" situations where the "submerged land under navigable water has

---

[1] As the Florida Supreme Court noted over a century ago:

> A state may make limited disposition of portions of such lands, or of the use thereof, in the interest of the public welfare, where the rights of the whole people of the state as to navigation and other uses of the waters are not materially impaired. The states cannot abdicate general control over such lands and the waters thereon, since such abdication would be inconsistent with the implied legal duty of the states to preserve and control such lands and the waters thereon and the use of them for the public good.

State v. Gerbing, 47 So. 353, 355 (Fla. 1908). This implied legal duty was "codified in article X, section 11, of the Florida Constitution, which recites that "[t]he title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people." 5F, LLC, 142 So. 3d at 945.

17

been or will be dredged and filled to create upland." Id. The court recognized that a "common thread" in the caselaw is "that the rights of the public are superior to those of private landowners—whether riparian owners or submerged land owners." Id.

As such, a viable legal theory is that governmental action may, in some limited circumstances, provide those who are substantially affected with the right to seek administrative review by challenging activities on state submerged lands now held by third parties. On the record presented, it appears that the conveyed submerged lands abutting Watson Island remained submerged at the time of the plaintiffs' petition (see Appendix B – portion of property labeled "Submerged Parcel"); at what stage dredge and fill activities may be taking place was not known at oral argument. And we aren't told what uses were made of the submerged lands from 1949 until the present day. Nonetheless, at least facially it appears that the plaintiffs have alleged a sufficient legal theory based on the proposed change in use of the still-submerged lands. Of course, submerged lands that are conveyed into private hands and then improved do not necessarily transgress the public trust doctrine; the test is "if the grant of sovereignty land to private parties is of such nature and extent as not to substantially impair the interest of the public in the remaining lands and waters it will not violate the inalienable trust doctrine." Holland v. Fort Pierce Fin. & Constr. Co., 27 So. 2d 76, 81 (Fla. 1946). Moreover, this appears to be one of those "increasingly rare" situations where dredge and fill activities may be converting state

submerged lands into uplands for private uses, which has become less common than earlier in the State's history before the environmental movement. 5F, LLC, 142 So. at 946.

Turning to the main point, the 1949 grant was a very limited one, restricting the uses of Watson Island to only public, non-private uses with a threat of reverter. It stands to reason that if modifications to those restrictions have a significant and direct effect on the legally-recognized interests of affected property owners, they may be subject to some degree of administrative and ultimately judicial review. If that is the case, whether the modifications are proprietary or regulatory comes into play, the latter being subject to Florida's administrative procedures act, the former less clear in this regard. Sexton v. Bd. of Trs. of Internal Imp. Trust Fund of State of Fla., 101 So. 3d 946, 948 (Fla. 1st DCA 2012) (Makar, J., concurring) ("While the caselaw holds that the APA applies when the Board is acting in its regulatory capacity, . . . it is less than clear in defining the circumstances when the exercise of proprietary powers subjects the Board to the APA procedures."); see State, Bd. of Trs. of Internal Imp. Trust Fund v. Lost Tree Vill. Corp., 600 So. 2d 1240, 1243 (Fla. 1st DCA 1992) ("Although the Board, acting in its proprietary capacity as owner of sovereign submerged lands, 'is different from other state agencies acting in a regulatory capacity,'. . . the policies underlying the public trust doctrine do not of themselves exempt the Board from the operation of the APA.") (citation omitted).

The Board says the challenged modifications to the deed restrictions were "the exercise of a minor and purely propriety right" and that the State's "only interest is a distant proprietary role completely separate, and disconnected from any rulemaking or other action subject to the jurisdiction of the APA." But unlike a discrete and limited grant of an easement to allow for the construction or maintenance of a bridge, pier, or dock over or on submerged lands, see Sexton, the modifications of the restrictions to the original 1949 deed in this case are qualitatively and quantitatively quite different. They do not facilitate an existing purely proprietary project in a minor way; instead, the Board's action in modifying the deed restrictions is akin to a major zoning modification that could trigger substantial impacts on the public, i.e., a regulatory action, particularly as to those submerged lands that might be subject to dredge and fill activities not previously authorized (presumably the submerged lands too would be subject to the deed's use restrictions). Thus, at this earliest stage of this proceeding, it appears that plaintiffs have alleged a viable legal theory for challenging the modifications to the 1949 deed, such that dismissal of plaintiffs' administrative challenge with prejudice was premature. Washington Cnty. v. Nw. Fla. Water Mgmt. Dist., 85 So. 3d 1127, 1130 (Fla. 1st DCA 2012) (concluding that "the District incorrectly determined it lacked jurisdiction over Appellants' petitions because the Plan is not subject to administrative challenge"); Ft. Myers Real Estate Holdings, LLC v. Dep't of Bus. &

20

Prof'l Reg., Div. of Pari-Mutuel Wagering, 53 So. 3d 1158, 1161 (Fla. 1st DCA 2011) (reversing dismissal with prejudice based on "settled principle of administrative law that a person whose substantial interests are determined by an agency is entitled to some kind of hearing—either formal or informal—to challenge the agency's decision once the agency's 'free form' process is complete").

Plaintiffs must also have standing. In that regard, what is alleged here is different from mere run-of-the-mill proprietary actions on a minor scale. If deed restrictions originally allowed only a public beach adjoining or a small, one-story public fishing pier over submerged lands, but by deed modification years later the property's use was transformed into a massive private commercial project of the type alleged, it takes little imagination to envision the potential impacts on those living nearby. Here, the plaintiffs—who reside on adjacent Venetian Causeway a few hundred yards directly north of the project—have alleged some of such impacts, which are the type of special injuries that differ from those of the public generally. See U.S. Steel Corp. v. Save Sand Key, Inc., 303 So. 2d 9 (Fla. 1974).

All this said, the limited issue presented on appeal is whether the plaintiffs are entitled to an administrative proceeding; we are not asked to decide who wins or loses, only whether plaintiffs get a hearing on their legal theory, keeping in mind that at this point they have merely made factual allegations and alleged injuries. Based on their allegations, they have sufficiently pled a preliminary basis to permit

them to administratively challenge the Board's modifications to the 1949 deed.

**APPENDIX A**



"View of causeway from Goodyear Blimp," Florida Photographic Collection.

## Appendix B



SITE

Plaintiffs

UPLAND PARCEL

SUBMERGED PARCEL

WATSON ISLAND

Submerged Parcel

Upland Parcel

0    250    500
Feet

**CITY OF MIAMI**

Biscayne Bay\Watson Island

24